**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0007-15T2

NEW JERSEY DEPARTMENT
OF CHILDREN AND FAMILIES,
DIVISION OF CHILD PROTECTION
AND PERMANENCY,

       Petitioner-Respondent,

v.

L.O.,

       Respondent-Appellant.

_____

APPROVED FOR PUBLICATION

June 17, 2019

APPELLATE DIVISION

Argued May 21, 2019 – Decided June 17, 2019

Before Judges Fisher, Suter and Firko.

On appeal from the New Jersey Department of Children and Families, Division of Child Protection and Permanency, Agency Docket No. AHU 13-0922.

Michael K. Furey argued the cause for appellant (Day Pitney LLP, attorneys; Michael K. Furey and Michael L. Fialkoff, on the brief).

Christina A. Duclos, Deputy Attorney General, argued the cause for respondent New Jersey Department of Children and Families (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Christina A. Duclos, on the brief).

Amy E. Vasquez argued the cause for amicus curiae New Jersey State Bar Association (New Jersey State Bar Association, attorneys; John E. Keefe, Jr., of counsel; Amy E. Vasquez, on the brief).

Katherine E. Haas argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey, attorneys; Katherine E. Haas, Alexander R. Shalom, and Jeanne M. LoCicero, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this appeal, we consider for the first time whether an indigent parent or guardian – substantiated for child abuse or neglect – is entitled to the appointment of counsel when exercising the right to an administrative hearing. Because the potential consequences of those proceedings are of significant magnitude, we agree that, in this setting, counsel should be made available for indigent parents and guardians both at the administrative level and in any appeal of right to this court. Because that opportunity was denied defendant, we reverse the final agency decision and remand for a new administrative hearing.

The child at issue – Carolyn (a fictitious name) – was born in 2002. The record reveals that her parents, Steven and defendant Lola (also fictitious names) never married but began living together at the time of Carolyn's birth. Their separation in 2009 triggered an acrimonious family court custody battle; Lola

2

also obtained a domestic violence final restraining order against Steven, and he was criminally convicted for assault arising from the same domestic violence event.

In 2011, the family judge presiding over the custody litigation ordered reunification therapy to improve Steven's relationship with the child. Dr. S.-W. was appointed for this purpose and first saw father and daughter in May 2012. Their sessions, however, were limited because of assertions that Carolyn was too ill to attend. Dr. S.-W. soon formed the belief that Lola was the cause of Carolyn's emotional and physical stress, which was standing in the way of the reunification sessions; the doctor suspected what she referred to as "Munchausen By Proxy Syndrome."[1]

In light of Dr. S.-W.'s communications to and testimony before the family judge in the custody litigation, the judge temporarily changed "physical and residential" custody to Steven on March 12, 2013. The next day, Dr. S.-W.

---

[1] What is usually referred to as "Munchausen Syndrome by Proxy," or, more recently, "Factitious Disorder Imposed on Another," is a mental illness by which a person caring for another, often a child – in seeking attention – acts as if the cared-for individual has a physical or mental illness. Its effect on the cared-for individual results from the obstacles it creates for health care providers striving to identify the cared-for individual's nonexistent illness, thereby making the matter worse. See Munchausen Sydrome By Proxy, WebMD, www.webmd.com/mental-health/munchausen-by-proxy (last visited June 5, 2019); Stedman's Medical Dictionary 1906 (28th ed. 2005).

A-0007-15T2

wrote to the family judge, emphasizing that her "original diagnosis of Munchausen by Proxy Syndrome is <u>a correct characterization</u> of what has been going on with [Carolyn]" (emphasis added), and that there "is strong evidence that [Lola] is the cause of [Carolyn's] anguish, stress and physical symptoms"; a few days later, the family judge awarded Steven "temporary sole legal custody and temporary residential custody" of the child and limited Lola to one hour of visitation per week to be supervised at a Division of Child Protection and Permanency office.

The inflammatory nature of the Munchausen charge – even though that diagnosis was later largely disowned or found to be an improper or inaccurate label – appears to have been the impetus for the wedge driven between Lola and Carolyn. At the time Dr. S.-W. was urging her Munchausen diagnosis in mid-March 2013, the judge referred the matter to the Division for investigation. On June 19, 2013, the Division gave written notice to Lola that its investigation resulted in a substantiation of abuse or neglect; in his later testimony before the administrative law judge (ALJ), Division Investigator Kevin Buck acknowledged that Dr. S.-W.'s assertion that her Munchausen diagnosis was "a correct characterization" was "one piece of evidence the [D]ivision used to support [its position] that [Lola has] a mental health issue." The family judge

A-0007-15T2

entered an order continuing the new custody arrangement indefinitely, and Lola's supervised visitation was later suspended altogether.

Lola appealed the substantiation finding, and a hearing was scheduled and conducted before an administrative law judge (ALJ) in October 2014. The ALJ heard testimony from Buck, Dr. S.-W., and two Division experts, Drs. Stephanie Iacopelli and Colin Gass. The Division also had Lola evaluated by Dr. Michael Gentile, whose report was considered by the ALJ. Lola was not offered counsel and was left to conduct her own defense. She had no experts and only provided her own testimony in response.

In March 2015, the ALJ rendered her initial decision, rejecting the Division's substantiation of abuse or neglect. The ALJ found that the Division failed to demonstrate Carolyn "was actually a victim of Munchausen syndrome by proxy" and that the Division had been "[s]elective" in its focus on Lola's behavior. For example, the ALJ determined that the Division "shrewdly" quoted portions of Dr. Gentile's report to justify abuse when, in fact, Dr. Gentile's "entire medical opinion . . . casts doubts" on that finding. According to the ALJ, Dr. Gentile found "no criteria of major depressive disorder or panic disorder" and instead

> rendered a diagnosis of adjustment disorder with symptoms of anxiety and depression. [Lola] also

exhibited "mild symptoms of depression and anxiety," which Dr. Gentile attributed to "the acrimony of the divorce and the separation from her 10-year-old daughter."

The ALJ particularly pointed out that Dr. Gentile found that Lola:

> has full insight into her condition and any allegations of Munchausen by proxy behavior is more related to an attempt to manipulate the system, so that decisions are made in her favor versus the underlying psychopathology characteristic of Munchausen syndrome by proxy. Her pattern of overreacting in times of stress may qualify her for a diagnosis of histrionic personality disorder. Her attempts at manipulation are more suggestive of an antisocial personality disorder.

Dr. Gentile drew a conclusion, which the ALJ adopted, that Lola "does not suffer from psychiatric illness that would require psychotropic medication"; instead, according to the ALJ, Lola "would benefit from individual supportive psychotherapy to help her adjust and cope with her current situation."

In light of these and other findings, the ALJ determined that Lola's "behavior was the result of an ongoing acrimonious marital breakup and custody battle over her daughter" and the credible evidence did not preponderate to show "that [Lola] created a substantial risk of harm to [Carolyn's] health and safety based on [Lola's] mental-health issues or emotional impairment." The ALJ

6

concluded that Lola's behavior, "while inappropriate, did not rise to the level of gross or wanton neglect."

The Division filed exceptions, to which Lola responded, albeit out of time. The Assistant Commissioner accepted Lola's late submission but rejected the ALJ's initial decision and reinstated the substantiated finding that Lola emotionally abused the child. The Assistant Commissioner determined: that Carolyn had suffered actual harm and that Lola's conduct was deliberate because she "knew or should have known that her actions were having an impact" on the child; that Lola's conduct – including the canceling of multiple therapy sessions with no attempts to reschedule – was not to Carolyn's benefit; and that Lola's conduct caused the child anxiety, gastrointestinal issues, and panic attacks, all of which disappeared once Lola's unsupervised contact with the child was cut off. This final decision directed the inclusion of Lola's name in the Child Abuse Registry pursuant to N.J.S.A. 9:6-8.11.[2]

---

[2] It isn't difficult to conclude that the Munchausen misstep turned into something of a runaway train. It seems to have influenced the judge's referral in the first place – since that referral came right after Dr. S.-W. reconfirmed with the family judge that her Munchausen diagnosis was "a correct characterization" of Lola's actions – and the judge's rulings thereafter influenced the Assistant Commissioner's rejection of the ALJ's findings, in that the Assistant Commissioner relied on the family judge's opinion in substantiating abuse. Lola's appointed counsel here argues to great effect that the Assistant Commissioner may have overstepped her authority when taking judicial notice

Still without counsel, Lola appealed this final agency decision in August 2015. She immediately moved in this court for: the appointment of counsel; permission to proceed as an indigent; permission to supplement the record; and a determination that she was entitled to free transcripts of the evidentiary hearing before the ALJ. We granted the indigency motion but denied Lola the right to counsel, free transcripts and supplementation of the record.

Lola forthwith moved for leave to appeal in the Supreme Court. In January 2018, the Court granted leave to appeal in part, directed the Division to order and pay for the transcripts, and appointed current counsel to represent Lola in this court. The Supreme Court also authorized appointed counsel "to argue the general and recurring issues of the right of indigent appellants like movant to free transcripts and the assignment of counsel to prosecute an appeal from an administrative proceeding that substantiates findings of abuse and neglect and

of the family judge's opinion that may have been influenced by the Munchausen misstep. Other later proceedings before another administrative agency based on Lola's claim that Dr. S.-W. engaged in professional misconduct in this matter – apparently centering on her Munchausen diagnosis – led to entry of a November 2017 consent order which enjoined Dr. S.-W. from performing forensic psychological services and memorialized her voluntary and permanent retirement of her license to practice marriage and family therapy when her license expired in June 2016. Clearly, the event that played a large role in all that we now consider – the unsubstantiated Munchausen diagnosis – posed for Lola levels of complexity and sophistication that would put any unrepresented litigant to an overwhelming disadvantage.

A-0007-15T2

directs the listing of their names in the child abuse registry."[3] The matter was remanded to this court for disposition of Lola's appeal and our consideration of the broader question about the right to counsel in this setting.

After the parties filed their merits briefs, the matter was listed for disposition without oral argument on January 23, 2019. Upon review of the parties' written submissions, this court scheduled oral argument and invited the New Jersey State Bar Association (the State Bar), the American Civil Liberties Union (ACLU), and the Public Defender's Appellate Section of the Office of Parental Representation (OPR-A) to file amicus briefs on the right-to-counsel argument. The State Bar and ACLU filed briefs. OPR-A declined the invitation but its managing attorney wrote to this court to explain OPR-A's position, stating:

> Both due and fundamental fairness suggest appointed counsel is the equitable outcome for indigent parents faced with State investigatory findings that may alter their livelihoods, reputation, or aspects of custody and visitation of their children now, or future born.

---

[3] This directive would appear to limit our consideration to whether someone in Lola's position is entitled to counsel when appealing a final agency decision in this setting. In briefing the matter, however, Lola's appointed counsel argues that Lola was entitled to counsel at the administrative level. Because no one has argued that Lola, in asserting broader rights to counsel, has exceeded the scope of the Supreme Court's authorization, or that the issue is not otherwise ripe for our consideration, we will consider not only the argument that Lola was entitled to the appointment of counsel in this court but at the administrative level as well.

A-0007-15T2

> Unfortunately, until the [L]egislature acts to fund this representation through the Office of the Public Defender, this office is unable to ease the burden to those parents in these situations.

In her merits brief, Lola argues that indigent parties should have the right to appointed counsel in administrative proceedings in light of the severe consequences that result from the finding itself as well as inclusion in the Child Abuse Registry, which imposes limitations on employment and other relationships. In response, the Department of Children and Families argues, among other things, that because the Child Abuse Registry is cloaked in confidentiality, it is of no great consequence when a parent or guardian is listed; the Department also argues that administrative proceedings like that which occurred here have been conducted for years without an indigent being given the right to appointed counsel and, because the legal landscape has not since changed, there's no need for this court to take the drastic step urged by Lola. The ACLU agrees with Lola's position on the right to counsel and further emphasizes the need for that same right to attach at the appellate level. The State Bar sides with the Department and further argues that if this court were to find a right to counsel, the burden of representing indigent parties similarly situated should not fall upon the Bar.

We agree with Lola and the ACLU and hold that: (1) the consequences of a child-abuse substantiation are of sufficient magnitude to warrant the appointment of counsel for an indigent defendant; (2) that right attaches not only to the administrative proceedings commenced when the government agency provides the parent or guardian with written notice that an investigation has substantiated abuse or neglect, but also when a final agency decision has been appealed to this court as of right and it further includes the right to free transcripts; and (3) until such time as the Legislature makes provision, the right to counsel shall be enforced by courts and agencies through the appointment of pro bono counsel from the Madden[4] list. As a result, we reverse and remand for a new substantiation hearing.

I

New Jersey has a long and proud tradition of recognizing and vindicating the right to counsel in criminal proceedings dating back to the State's 1776 Constitution. In 1971, the Supreme Court noted that the right to appointed counsel in petty criminal matters had not previously been recognized but concluded "no indigent defendant should be subjected to a conviction entailing imprisonment in fact or other consequence of magnitude without first having

---

[4]  Madden v. Delran, 126 N.J. 591 (1992).

A-0007-15T2

had due and fair opportunity to have counsel assigned without cost." Rodriguez v. Rosenblatt, 58 N.J. 281, 295 (1971) (emphasis added).

Rodriguez's "consequence of magnitude" requirement has since informed our courts when considering whether the right to counsel in noncriminal settings is constitutionally required. In Pasqua v. Council, 186 N.J. 127, 149 (2006), the Court held that an indigent defendant must be assigned counsel in civil matters when incarceration may be a consequence of the defendant's willful failure to pay child support. The right to counsel also attaches to: Megan's Law tier classification matters, Doe v. Poritz, 142 N.J. 1, 31 (1995); involuntary civil commitment proceedings, In re S.L., 94 N.J. 128, 142 (1983); contempt proceedings alleging a violation of a restraining order, State v. Ashford, 374 N.J. Super. 332, 337 (App. Div. 2004); motor vehicle matters when license suspension is at issue, State v. Moran, 202 N.J. 311, 325 (2010); and matters in which a significant fine may be imposed, State v. Hermanns, 278 N.J. Super. 19, 30 (App. Div. 1994).

In family matters, the Supreme Court recognizes an indigent parent or guardian's right to appointed counsel in actions seeking the termination of parental rights, N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 306-07 (2007), and in private adoption proceedings, In re Adoption of J.E.V., 226

N.J. 90, 107-08 (2016). We have also recognized that an indigent parent or guardian is entitled to appointed counsel when a court contemplates a temporary change of custody, Crist v. N.J. Div. of Youth & Family Servs., 128 N.J. Super. 402 (Law Div. 1974), aff'd in part, rev'd in part, 135 N.J. Super. 573 (App. Div. 1975), because a temporary-custody proceeding "is frequently a prelude to a petition to terminate parental rights," 128 N.J. Super. at 416.

Even closer to the question at hand, our Supreme Court – alluding to Crist – observed that it has "long [been] recognized" that in Title Nine actions "parents charged with abuse or neglect of their children have a constitutional right to counsel." N.J. Div. of Youth & Family Servs. v. E.B., 137 N.J. 180, 186 (1994). The Legislature has recognized this as well. By enacting N.J.S.A. 9:6-8.43, the Legislature declared not only that courts in Title Nine cases "shall advise" parents and guardians of their "right to have an adjournment to retain . . . and consult with [counsel]" but that those courts must also advise indigent parents and guardians of their right to "apply for an attorney through the Office of the Public Defender." Although the right to counsel in Title Nine matters is often described in broad terms, see, e.g., N.J. Div. of Child Prot. & Permanency v. G.S., 447 N.J. Super. 539, 555 (App. Div. 2016), it arises from the self-evident fact that the "right to custody of one's children and the protection of the integrity

13

of the family from arbitrary governmental action is a fundamental constitutional right," N.J. Div. of Youth & Family Servs. v. L.M., 430 N.J. Super. 428, 447 (App. Div. 2013) (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)). See generally Fall & Romanowski, Child Custody, Protection & Support § 31:1-2(e) (2019 ed.). But, so far, the right to counsel has been recognized as encompassing only those abuse or neglect actions commenced in the Superior Court; the right has not yet been held to apply in similar proceedings lodged and adjudicated at the administrative level.

We have recognized that a parent or guardian has the right to a hearing when the Division's investigation into an abuse or neglect referral has either been "substantiated," N.J. Div. of Youth & Family Servs. v. M.R., 314 N.J. Super. 390, 409 (App. Div. 1998), or "established," N.J. Div. of Child Prot. & Permanency v. V.E., 448 N.J. Super. 374, 401-02 (App. Div. 2017).[5] And, while it may not immediately follow that the right to a hearing alone establishes the

_____

[5] Of note, the referral here was made on March 12, 2013. A few weeks later, an amendment to the Department's regulatory framework, which added the less onerous "established" category, N.J.A.C. 3A:10-7.3(c)(2), went into effect. We need not decide whether this new category was available in the investigation of this referral (the notice was served on Lola after the regulation's April 1, 2013 effective date). Because the Division's investigation "substantiated" the referral here and because it is not clear that the "established" category was available at the time of the investigation, we need not here decide whether the right to counsel attaches when a parent or guardian challenges an "established" finding.

right to counsel, we are satisfied the evolution of the latter in matters where the government has taken action that impacts parental rights and family integrity has inexorably led us to this place.[6] With these pages of history in mind, we proceed to consider whether the government action here actually threatened or had a likelihood of extracting a "consequence of magnitude." Rodriguez, 58 N.J. at 295.

The parties do not dispute that a substantiation of child abuse or neglect compels the parent or guardian's inclusion in the Child Abuse Registry. N.J.S.A. 9:6-8.11; N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 619-20 (App. Div. 2010). They also do not dispute that inclusion in the Child Abuse Registry is permanent. There is no expiration date on this governmentally-imposed scarlet letter. And there is no known mechanism by which a parent or guardian may seek removal from the list or relief from its stigma and

---

[6] Although discussed at oral argument, the parties have not briefed nor otherwise argued that the child was entitled to representation in either the administrative proceedings or here. That is another troubling question we need not decide now, but we do not foreclose its consideration in this matter following today's remand to the administrative level.

consequences.[7]  So, we proceed by recognizing that this one consequence is indelible.

Next, we have already recognized that substantiation has greater consequences than the mere listing itself.  As then Judge (later Justice) Long said for this court in <u>Matter of East Park High School</u>, 314 N.J. Super. 149, 163 (App. Div. 1998), the listing not only injures the parent's "good name" but is also "inextricably intertwined with [the parent's] capacity to obtain employment in a vast array of education-related jobs."  The listing may also tend to prevent the parent from fostering or adopting children in the future.  <u>V.E.</u>, 448 N.J. Super. at 392 n.7, 393; N.J.S.A. 30:5B-25.3.

To be sure, that a parent or guardian has been listed in the Child Abuse Registry is – in general – a confidential matter.  N.J.S.A. 9:6-8.10a(a).  But the parent hardly becomes "a nameless number on a list which was later mislaid."[8] Far from it.  As we observed in <u>V.E.</u>, there is a "lengthy list of institutions, governmental entities, and persons to whom the Division may release

---

[7]  Some Megan's Law sex offenders are able to apply to be released from their registration obligations after a conviction-free fifteen years. N.J.S.A. 2C:7-2(f). Parents and guardians listed in the Child Abuse Registry have not been given this same right allowed some sex offenders.

[8]  Boris Pasternak, <u>Doctor Zhivago</u> (1957).

16

information contained in the registry regarding any finding of abuse or neglect." 448 N.J. Super. at 392 (citing N.J.S.A. 9:6-8.10a(b)(1) - (23), and (c) - (g)). Notwithstanding the statute's general confidentiality requirement, "the Division is empowered to disclose 'all information' from its investigations of abuse or neglect 'regardless of whether the allegations are substantiated and whether . . . the information has been entered in the Central Registry.'" Id. at 392 (quoting M.R., 314 N.J. Super. at 402); see also N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 27 (App. Div. 2004) (acknowledging that the scope of permissible disclosures is extensive). Disclosure may be made to police, doctors, hospitals, the Office of Administrative Law, grand juries, and the courts. N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 170 n.2 (2015); V.E., 448 N.J. Super. at 392-93.

Perhaps more concerning beyond inclusion in the Child Abuse Registry is the often direct and dire impact substantiation has on the relationship between the parent and the affected child or other children as well. The administrative finding, as the Supreme Court has already recognized, may "provide a basis for an action to terminate a parent's custodial rights to a child." N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 179 (2014); V.E., 448 N.J. Super. at 393-94. Substantiation alone – regardless of inclusion in the Child Abuse

Registry – has the potential to directly impact parents' "constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); see also N.S., 412 N.J. Super. at 619. Although further interference or termination has not been sought here, we are mindful that the substantiation appears to have played a role in the family judge's suspension of Lola's visitation rights – a circumstance that continues even now.[9]

If all this were not enough to satisfy Rodriguez's "consequences of magnitude" standard, one cannot help but be struck by the simple injustice that arises from the fact that an indigent parent or guardian facing a child abuse charge in Superior Court is entitled to counsel but not when similarly charged at the administrative level. As things now stand, the Division's choice of forum determines whether indigent parents and guardians will or won't receive the assistance of counsel. That this is where the line has been drawn is not in doubt; in describing the status quo ante – the state of things up until now – in the availability of counsel for indigent parents or guardians in child abuse and neglect matters, the Department accurately asserts that "[h]ad the Division

---

[9] We are advised that Lola has not seen Carolyn in the past five years during the suspension of supervised visitation and the pendency of this appeal.

sought care, custody, or supervision of [Lola's] children, a Title 9 complaint would have been filed and [Lola] would have been appointed counsel under N.J.S.A. 9:6-8.43(b)[,] [but] [n]o such mandate attaches to administrative challenges to abuse and neglect findings." So, had the litigation about this child taken a different turn – if, for example, there was no pending custody suit – the Division may very well have sought to invoke the Superior Court's jurisdiction and that would have allowed for the appointment of counsel for Lola; because the Division proceeded administratively, Lola was left to fend for herself. We reject the notion that this artificial distinction should be determinative of the targeted parent's right to counsel.

There is no valid or logical reason for maintaining the distinction between the existence of a right to counsel in a Superior Court child abuse action and the denial of the same right at the administrative level; the present distinction further reveals that simple justice requires today's ruling. All things considered, the substantiation of child abuse carries "consequences of magnitude" that compel our determination that indigent litigants at the administrative level are entitled to the inestimable right to counsel.

To summarize, the consequences threatened or likely to result in matters like this seem to us greater than those that have been found sufficiently dire to

19

warrant the constitutional right to counsel in other settings.  See, e.g., Pasqua, 186 N.J. at 149 (finding that brief incarceration to coerce payment of a willful refusal to pay child support is a consequence of magnitude that necessitates the appointment of counsel for indigents facing that potential); State v. Hamm, 121 N.J. 109, 124 (1990) (finding that a license to drive "is nearly a necessity [and] its deprivation is clearly a 'consequence of magnitude'").  In Pasqua, 186 N.J. at 149, the Court said that it could "find no principled reason why an indigent facing loss of motor vehicle privileges or a substantial fine in municipal court . . . would be entitled to counsel under state law but an indigent facing jail for allegedly willfully refusing to pay a child support judgment would not."  So too here.  We find no principled reason why, if the consequences in Pasqua or the suspension of driving privileges considered in Hamm give rise to a right to counsel, administrative proceedings that substantiate child abuse or neglect – with all the consequences we have identified – should not.  Indeed, we gather that the Supreme Court already conveyed as much when it observed in E.D.-O. that it was "mindful of the consequences of enrollment in the Registry and the duration of those consequences," and that it was "aware that for some acts, enrollment in the Registry may seem draconian."  223 N.J. at 195; see also D.N. v. K.M., 216 N.J. 587, 592-95 (2014) (Albin, J., dissenting).

The proof of our holding is in the pudding. Child abuse proceedings are legally complex as, often, are the particular factual disputes that they pose.[10] The transcripts in the proceedings before the ALJ reveal that Lola was incapable of navigating, let alone untangling, these complexities. She was unaware of and therefore unable to properly object to the admission of evidence damaging to her. Not surprisingly, she was ill-equipped to adequately cross-examine witnesses or elicit testimony that might have been helpful. She was also faced with the unusual circumstance of having to deal with Dr. S.-W.'s attorney-

---

[10] We need not here trace the many cases in which abuse or neglect has and hasn't been found in order to demonstrate that a fine line is often drawn in such matters. It suffices for present purposes to observe that, starting with G.S. v. Department of Human Services, 157 N.J. 161, 178-79 (1999), the Court recognized that the exercise of a minimum degree of care poses a fact-sensitive question; the parent or guardian's mistakes must constitute more than simple negligence but less than the intentional infliction of harm. Not only is that line difficult to define but whether it has been crossed also depends on an examination of all the "surrounding circumstances." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369-70 (2017); E.D.-O., 223 N.J. at 180. It asks too much of laypersons, whose personal involvement can't help but influence their ability to advocate their position, to rationally navigate among these legal concepts. Even in the simplest case, when the relevant facts may be clear or even undisputed, where or whether a particular charge of abuse or neglect falls along the continuum defined by our case law, see N.J. Dep't of Children & Families v. T.B., 207 N.J. 294, 309 (2011), may be the subject of much debate and pose thorny questions even for seasoned attorneys, see E.D.-O., 223 N.J. at 182-85; this seems to us demonstrated by the conflicting conclusions reached by the ALJ and the Assistant Commissioner on the same factual record. Clearly, Lola was greatly disadvantaged in this close case by being left to defend herself throughout the administrative proceedings.

husband's interference during the hearing. Lola complained about his signaling to Dr. S.-W. during cross-examination; rather than halt this interference, the ALJ allowed Dr. S.-W.'s husband to lodge objections to Lola's earnest but ineffective cross-examination.

Lola attempted but failed to successfully move sixty-three documents into evidence. And she had no expert of her own to refute the Division's considerable presentation. Although Lola was successful in obtaining a favorable result from the ALJ, her inability to adequately advocate for her own position may have ultimately been the root cause for the final agency decision rendered against her in this close case.

Any adversary system that claims the ability to render just decisions must necessarily feature "partisan advocacy on both sides." Herring v. New York, 422 U.S. 853, 862 (1975). Just as it is important to ascertain when a child has been abused or neglected, it is important that a parent not be labeled an abuser, and that the parental right not be infringed, through an infirm proceeding or tilted playing field. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976); J.E.V., 226 N.J. at 103. In such matters, the State has, at considerable expense, provided the Division with the services of the Attorney General's office. Yet the State has not provided representation for indigent parents and guardians on the other

22

side of these contests; to ensure a process that renders trustworthy outcomes, the right to counsel must be offered to indigent parents and guardians. Indigent litigants are asked to climb a steep hill in these settings. They are faced with the stress caused by the circumstances themselves (here a hotly contested custody battle) and the potential for a child abuse or neglect substantiation, which carries additional significant consequences. In attempting to avoid these consequences, the litigant must take on the Attorney General's office and the Division's witnesses and experts. The litigant must also navigate all the procedural and substantive hurdles of litigation that are by no means as simplistic as, for example, those involved in a municipal trial over a speeding ticket. An indigent parent or guardian in this setting should not face all these obstacles without the assistant of counsel.

As has been said in another similar context, "[i]f the matter has any complexities" – and there was no shortage of complexities here – "untrained [litigants are] in no position to defend [themselves] and, even where there are no complexities, [the] lack of legal representation may place [them] at a disadvantage." Rodriguez, 58 N.J. at 295. For a litigant facing the government and all its lawyers and resources in this setting, what the Court said in Gideon

v. Wainwright, 372 U.S. 335, 344 (1963) in the criminal setting proves equally true here: lawyers are "necessities, not luxuries."

We conclude that indigent litigants are entitled to the appointment of counsel when faced with a Division declaration that its investigation has substantiated that litigant for child abuse or neglect.

II

We reach the same conclusion when considering the right to counsel on appeal. Those substantiated for abuse by way of a final agency decision are entitled to an appeal to this court as of right. R. 2:2-3(a)(2). Since an appeal is available for those who can pay for it, it must also be provided for those who can't. See Jones v. Barnes, 463 U.S. 745, 751 (1983); State v. Bianco, 205 N.J. Super. 462, 472 (App. Div. 1985), aff'd, 103 N.J. 383 (1986). For an indigent party to have an equal and meaningful opportunity to be heard on appeal, the right to counsel must attach when the administrative matter has come before this court on an appeal as of right.[11]

---

[11] We confine our holding to the right to counsel when there is an appeal as of right; we offer no view as to whether that right attaches when the indigent is desirous of pursuing discretionary review. Accord Douglas v. California, 372 U.S. 353, 356 (1963).

This would include the right to free transcripts, for how else could appointed counsel meaningfully attack the findings rendered against the indigent litigant?  As the Supreme Court held in Griffin v. Illinois, 351 U.S. 12, 18 (1956), "[t]here is no meaningful distinction between a rule which would deny the poor the right to defend themselves in a trial court and one which effectively denies the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance."

Experience reveals that the right to trial counsel and the right to appellate counsel go hand in glove.  If the right isn't afforded at the trial level, appointed counsel on appeal may find little to work with because of the limitations on the scope of appellate review.  See Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980) (final agency decisions are entitled to deference and should be sustained unless "arbitrary, capricious or unreasonable" or unsupported "by substantial credible evidence in the record as a whole").  And, if only trial counsel is provided and a litigant is left to pursue the right to appeal without counsel, any good that may have been accomplished by trial counsel at the lower level may be undone when the litigant is left unrepresented on appeal.

So, just as in other areas, the right to trial counsel for indigent parties includes the right to counsel in an appeal as of right.  Gideon's declaration of the

right to counsel at a criminal trial was soon followed by the Court's determination that criminal defendants are entitled to counsel when pursuing an initial appeal as of right, Douglas, 372 U.S. at 356-58, and later still, the Court held that this right requires not just nominal counsel but "the effective assistance of counsel on such an appeal," Evitts v. Lucey, 469 U.S. 387, 389 (1985). Similarly, our Supreme Court has declared that a litigant facing the termination of parental rights is entitled to the effective assistance of counsel both at trial and on appeal. See B.R., 192 N.J. at 306. Although the parental relationship is not as directly threatened in proceedings like those considered here as in a parental termination matter or private adoption matter, we are satisfied the consequences are of sufficient magnitude to warrant the attachment of the right to counsel; the adjudication itself may play a role in a future infringement or termination of the parental relationship.

To ensure an indigent litigant isn't improvidently shoved out onto a slippery slope toward termination or a severe and permanent limitation on a parent-child relationship, we conclude that the right to counsel, which we have found attaches at a hearing on the substantiation of a charge of abuse, should also attach when a final agency decision of substantiation is appealed to this court; it follows that free transcripts must also be provided.

## III

The State Bar argues that, if such a right is found, the State should be required to provide the funding for such representation without that burden falling on the Bar.

Our response is no different than that offered by J.E.V., where the Supreme Court found a right to counsel in private adoption litigation. The Court recognized that the Office of Parental Representation "has developed expertise in this area," but in the absence of "a funding source," the Court declined to require that office to take on these additional assignments. 226 N.J. at 113. The J.E.V. Court also noted that the Legislature has in the past "acted responsibly" in providing counsel for the poor when constitutionally required. Ibid. After Crist, the Legislature enacted N.J.S.A. 30:4C-15.4(a), which directs judges to appoint the Public Defender to represent indigent parents seeking counsel in parental termination cases. Ibid.

But the Court also realistically understood the existence of a present need to address the problem while awaiting legislative action. Ibid. So, the J.E.V. Court "invite[d] volunteer organizations to offer their services, as pro bono attorneys have done in other areas," while also concluding that, absent

volunteers, there would likely be a need to resort to the <u>Madden</u> list, even though that is "not an ideal solution." <u>Ibid.</u>

We find ourselves in that same position and, in adhering to <u>J.E.V.</u>'s guidance in a comparable circumstance, we come to the same conclusion. In the case at hand, we will expand current pro bono counsel's able assistance to the proceedings that follow at the administrative level. In other similar matters, absent the alternatives suggested in <u>J.E.V.</u>, we forthwith commend to ALJs the utilization of the <u>Madden</u> list to secure counsel for parents and guardians similarly situated.

Contrary to other occasions when the Bar has been called upon to assist indigent litigants, our holding does not open the proverbial floodgate that may have been of concern when the Court considered the right to counsel in other matters. <u>See</u> <u>D.N.</u>, 216 N.J. at 592 (where Justice Albin noted in his dissent that our courts annually dispose of approximately 35,000 DWI cases, many of which require the assignment of pro bono counsel). In response to our inquiries about the impact such a holding would have here, the Attorney General advised that at the administrative level in the calendar years 2016, 2017, and 2018, there were adjudicated, respectively, sixty-three, sixty-two, and forty-six contested cases. While it may be fair to assume there would have been more if each parent

28

or guardian noticed of a substantiation was also advised of the right to appointed counsel, we have been given no reason to assume the number would have been so great as to cause the State Bar to urge that we find a different solution. Accordingly, even if the existence of a right to counsel turned on a "cost analysis" – it doesn't[12] – the number of appointments necessary in this area pales in comparison to others where the right to counsel was acknowledged notwithstanding a significant impact on the Bar.

* * *

Because Lola was not advised that, if indigent, she had a right to appointed counsel, we vacate the final agency decision and remand for further proceedings to determine whether the Division's investigation properly led to the substantiation of child abuse or neglect. We also direct the Department to forthwith include in their notices that parents or guardians who have been substantiated for abuse or neglect are entitled to the appointment of counsel if they cannot afford counsel. And, in this particular matter, we direct that Lola's

---

[12] As Justice Albin recognized in his dissent in D.N., "[h]ad the United States Supreme Court taken the cost-analysis approach, Gideon would not be on the books today, nor would Rodriguez"; "[o]ur approach has not been that if too many indigent defendants require counsel, we will provide counsel to none." 216 N.J. at 592.

29

current appointed counsel continue to represent her in the remand proceedings and any appeal as of right that may follow.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0007-15T2