# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1439-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.N.,[1]

      Defendant,

and

T.N. (a/k/a T.L.),

      Defendant-Appellant.

_____

IN THE MATTER OF
E.N., a minor.

_____

      Submitted April 8, 2025 – Decided April 23, 2025

      Before Judges Gilson and Firko.

---

[1] We use initials and pseudonyms to protect the identity of the family pursuant to <u>Rule</u> 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0124-22.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Laura M. Kalik, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Lakshmi Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor E.N. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this Title 9 case brought by the Division of Child Protection and Permanency (Division), defendant T.N. (Tammy), a mother, appeals from the Family Part's January 3, 2023 order. The judge found Tammy had abused her infant son E.N. (Eric) in violation of N.J.S.A. 9:6-8.21(c)(4)(b), through her misuse of illegal drugs while she was pregnant with Eric, which caused his Neonatal Abstinence Syndrome (NAS). [2] We affirm.

---

[2] No findings were made against the father, defendant S.N. (Sean), and he is not a party to this appeal.

A-1439-23

I.

The pertinent facts were developed in depth at a two-day fact-finding hearing conducted before Judge Barbara C. Stolte in October 2022. The Division presented expert testimony from medical doctors, who have expertise in addiction medicine and neonatology, and testimony from two fact witnesses. Tammy testified in her own defense. Sean was not charged, and no findings of abuse or neglect were made against him.

In September 2021, Tammy started receiving treatment for opioid use at the Jewish Renaissance Medical Center (JRMC) after being diagnosed with Opioid Use Disorder. She was prescribed Suboxone.[3] Tammy was referred to the Medicated Assisted Treatment (MAT) program supervised by Dr. Cynthia Vuittonet.

In October 2021, Tammy took a pregnancy test, which came back positive. She also tested positive for cocaine at the time of her pregnancy test. Dr. Vuittonet informed the Division about Tammy's positive test results and

---

[3] Suboxone, generically known as Buprenorphine or Naloxone, "is a combination of medications administered for the treatment of opiate agonist dependence." Merck Manual: Professional Version, https://www.merckmanuals.com/professional/searchresults?query=suboxone (last visited April 15, 2025).

switched her medication to Subutex.[4]  Tammy complied with the MAT program from October 2021 until February 2022 and engaged in a substance abuse therapy program.  She did not show up for her March 2022 appointment. Tammy's prescription for Subutex was never refilled after February 2022.

On May 17, 2022, Eric was born at a hospital.  The Division received a referral that day from the hospital stating that both Eric and Tammy tested positive for cocaine.  Division caseworker Walkiria Guerra went to the hospital and spoke to a social worker who reported that Tammy stated she was taking Subutex during the pregnancy, prescribed by Dr. Vuittonet, and denied usage of any drugs.  Tammy was placed under arrest for testing positive for cocaine and on an outstanding Drug Court[5] warrant violation.  Tammy was informed that the Division would take custody of Eric upon her discharge.

Two days later, Eric was transferred to the Neonatal Intensive Care Unit because he was suffering from withdrawal symptoms, including excessive

---

[4]  Subutex is "an opioid medication . . . used to treat opioid addiction."  Subutex https://www.drugs.com/subutex.html (last visited April 15, 2025).

[5]  Effective January 1, 2022, the Drug Court Program was renamed the New Jersey Recovery Court Program to better reflect the primary goal of the program. Admin. Off. of the Cts., Notice:  Drug Court Name Change to New Jersey Recovery Court (Dec. 28, 2021).  We use "Drug Court" in this opinion.

crying, irritability, not eating, and tremors. He was diagnosed with NAS and treated for withdrawal symptoms under Dr. Surasak Puvabanditsin's care.

Eric was placed with a non-relative resource home after he was discharged from the hospital. Eric was subsequently moved to a relative's resource home. Tammy enrolled in a "Mommy and Me Program" at Eva's Village in an effort to obtain reunification with Eric. Tammy also began residing at Eva's Village, and her urine screens were negative for illicit substances.

The Division's theme at trial was that during her pregnancy, Tammy misused cocaine. Guerra testified that Tammy "had denied any usage of drugs at any point in her pregnancy." Randi Polinski, a Division supervisor, provided information about replacement options for Tammy to continue the Mommy and Me program through another resource. Dr. Vuittonet testified that she switched Tammy's medication from Suboxone to Subutex after learning Tammy was pregnant, which is safer for the fetus. Dr. Vuittonet confirmed that Tammy received a twenty-eight-day supply of Subutex on February 21, 2022 at JRMC according to the New Jersey Prescription Monitoring Program (PMP) and no further Subutex prescriptions thereafter.

The Division called Dr. Puvabanditsin to testify. The judge qualified him as an expert in the field of neonatology, a physician who is specially trained in

A-1439-23

caring for newborns and infants with medical problems. Dr. Puvabanditsin testified that Eric had symptoms consistent with NAS and was administered morphine to prevent a seizure. Dr. Puvabanditsin explained that Eric's Finnegan Score—a diagnostic guideline that assists clinicians assess whether a child is undergoing NAS—was elevated and severe enough to require treatment. Dr. Puvabanditsin opined that a positive urine screen for an infant indicates the cocaine use occurred a few days before birth. Because Eric had a positive opiate drug screen in his meconium, Dr. Puvabanditsin estimated that Tammy's drug use could have been a few weeks to a few months prior to delivery. The doctor opined that Eric's NAS was due to Tammy's "taking narcotic drugs during pregnancy."

Tammy testified that the last time she was at JRMC was February 2022. She stated that she had been evicted from her apartment, relocated, and had an arrest warrant issued against her by Drug Court because she lost her housing. Tammy testified that she was "scared" to go to JRMC because she feared being "picked up or turned in" and "didn't want to deliver [Eric] in jail."

At the hearing's conclusion, the judge found Tammy had abused Eric within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b). In her comprehensive oral opinion, the judge found the Division's witnesses credible and Tammy not

6

credible. Among other things, the judge noted Tammy claimed she did not use cocaine during her pregnancy, but her urine screens tested positive. The judge highlighted Tammy last received a Subutex prescription from Dr. Vuittonet on February 21, 2022, and there was no evidence that Tammy obtained another Subutex prescription from anyone after that date.

The judge summarized her conclusions as follows:

> [Dr. Puvabanditsin] testified he observed a high-pitched crying and inconsolable—child being unconsoled and shaking. [Dr. Puvabanditsin] testified he diagnosed [Eric] with NAS due to the Finnegan scores, which I believe he could consider, his own observations, which clearly he could consider, the positive [tests] for cocaine and opiates in the meconium, and the [forty-eight]-hour . . . onset . . . and the history of the mother. [Dr. Puvabanditsin] placed the child on morphine to alleviate the symptoms of NAS. [Dr. Puvabanditsin] testified that NAS was caused by [Tammy's] use of substance during pregnancy. And I do agree that the doctor does not necessarily need to be able to determine which drug caused it, and in this case, the child was positive for opiates and cocaine.
>
> And then finally, that [Eric] was given morphine for five days and did show improvement and then was taken off of the morphine.
>
> The Division has shown by a preponderance of evidence, that [Tammy]'s drug use during pregnancy caused actual harm to the child [Eric]. And that's based on the expert's opinion that this child suffered from withdrawal or NAS, which . . . is [the] harm in this case.

> That [Tammy] failed to exercise a minimum degree of care in providing proper supervision or guardianship and in this case inflicted harm upon the child, and instead her use of substances was willful and wanton and created a reckless disregard for the safety of this child [Eric].

On October 23, 2023, Eric was returned to the legal and physical custody of Tammy and Sean. This appeal followed.

Before us, Tammy primarily argues: (1) there was insufficient evidence to support the judge's legal conclusion that she abused or neglected Eric by using illicit drugs during her pregnancy; and (2) the Division failed to provide sufficient competent evidence Eric suffered from NAS as a result of Tammy's use of illicit drugs. The Law Guardian joins with the Division in opposing the appeal.

## II.

It is well settled that the scope of appellate review in this non-jury Title 9 setting is narrow. Appellate review of the Family Part's abuse or neglect finding is limited. N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015) (citing Cesare v. Cesare, 154 N.J. 394, 411 (1998)). The court must determine whether the decision "is supported by '"substantial and credible evidence" in the record.'" N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J.

8

420, 448 (2012) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)).

"Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, 154 N.J. at 413; see also N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010). In that vein, appellate courts should "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 261). A family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." F.M., 211 N.J. at 448 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

"Title 9 controls the adjudication of abuse and neglect cases." M.C. III, 201 N.J. at 343 (citing N.J.S.A. 9:6-8.21 to -8.73). "The focus of Title 9 'is not the "culpability of parental conduct" but rather "the protection of children."'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 368 (2017)

(quoting Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015)).

Title 9 defines an "abused or neglected child" as one under the age of eighteen whose

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [their] parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment.
>
> [N.J.S.A. 9:6-8.21(c)(4).]

The "minimum degree of care" element in subsection (c)(4) reflects "the intermediary position between simple negligence and the intentional infliction of harm." A.B., 231 N.J. at 369 (citing G.S. v. Dep't of Hum. Servs., Div. of Youth & Fam. Servs., 157 N.J. 161, 179 (1999)). The court must determine whether the parent or guardian "fail[ed] to exercise a minimum degree of care when [they are] aware of the dangers inherent in a situation and fail[] adequately to supervise the child or recklessly creates a risk of serious injury to that child." Ibid.

The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). Each case of alleged abuse is "generally fact sensitive." Id. at 33. The proofs must be evaluated based on the totality of the circumstances. Id. at 39.

Once, as here, abuse has been substantiated, the offender's conduct must be logged in the child abuse registry as "the repository of all information regarding child abuse or neglect that is accessible to the public pursuant to State and federal law." N.J.S.A. 9:6-8.11. The agency has no discretion under the statute to withhold or remove an offender's name from the registry once the Division has substantiated the allegations of abuse. See, e.g., N.J. Dep't. of Child & Fams. v. L.O., 460 N.J. Super. 1, 12 (App. Div. 2019).[6]

---

[6] The registry serves an important function in assuring that employers, day care centers, adoption agencies, and other organizations that deal with children are apprised of the harmful conduct that led a particular individual to be listed on the registry. N.J. Div. of Youth & Fam. Servs. v. M.R., 314 N.J. Super. 390, 399-402 (App. Div. 1998). "Employers may access the registry while fulfilling their legal obligation to 'consider child abuse or neglect information when conducting a background check or employment-related screening.'" Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 375 (2024) (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 26 (2013)).

Applying these well-established standards of review, we affirm Judge Stolte's determination of Tammy's abuse of Eric, substantially for the sound reasons set forth in the judge's detailed oral decision. We comment here on Tammy's specific arguments, none of which have merit.

A.

Tammy's main argument is that the judge misapplied the holding in N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165 (2014). Tammy asserts she demonstrated "reasonable compliance" with treatment and "considerable regard" for her own health and the unborn child by following Dr. Vuittonet's recommendation to switch to Subutex. Tammy maintains she continued to be compliant with treatment throughout the "bulk" of her pregnancy and was provided a twenty-eight-day supply of Subutex on February 21, 2022. According to Tammy, she was "afraid" to go to JRMC in March 2022 because she failed to attend Drug Court, a warrant issued for her arrest, and she did not want to end up giving birth to her son in prison.

Tammy further claims the Division offered no proof that she obtained Subutex illegally. According to Tammy, Dr. Vuittonet admitted she failed to check the PMP under Tammy's current name, T.N., but checked under her birth name, T.L., her date of birth, and other "qualifications" not specified in the

A-1439-23

record. Based on Dr. Vuittonet's testimony, Tammy argues the judge improperly "assumed" that Tammy obtained her medication illegally, thus essentially shifting the burden of proof to Tammy to prove she had a valid prescription for her medication and that she filled it properly.

Tammy's reliance on the Court's holding in Y.N. is misguided. Y.N. involved a pregnant woman who entered a methadone maintenance program for her opioid addiction, and whose child was born with severe withdrawal symptoms requiring two months of hospitalization. Id. at 168. The Court ruled that "a finding of abuse or neglect [could] not be sustained based solely on a newborn's enduring methadone withdrawal following a mother's timely participation in a bona fide treatment program prescribed by a licensed healthcare professional to whom she ha[d] made full disclosure." Ibid. (emphasis added).

In contrast, Tammy's use of cocaine and opiates during her pregnancy were unjustified, and she was not participating in a bona fide treatment program during the last trimester of her pregnancy. In Y.N., the mother was being prescribed methadone to help her detoxify from opioids that could have more significantly harmed her child, and Y.N. "followed the advice of a medical professional" in entering the "methadone maintenance program." Id. at 184.

A-1439-23

However, in the matter under review, Tammy stopped attending the JRMC program after her last visit on February 21, 2022.  Her prescription for Subutex was last filled on February 21, 2022.  The judge found Dr. Vuittonet credible in representing she last prescribed Subutex for Tammy on February 21, 2022 and could not find any subsequent prescriptions in the PMP.  The record supports that determination.  Moreover, there is other abundant, credible evidence that Tammy and Eric tested positive for cocaine and opiates when Eric was born.  Unlike Tammy, Y.N. was participating in a medically prescribed program under the care of a licensed professional when she gave birth.  Here, Tammy stopped participating in the program three months before Eric was born.  Moreover, Tammy's prescription filled on February 21, 2022 only lasted until the third week of March 2022, approximately two months before Eric was born.

We also reject Tammy's argument that Dr. Vuittonet did not check the PMP system for Tammy's engagement in another program under her new name T.N.  Dr. Vuittonet did check the PMP system using Tammy's name, date of birth, and qualifications.  That evidence was clearly relevant under N.J.R.E. 401, even if it was not dispositive.  Moreover, Dr. Puvabanditsin provided unrebutted testimony that Eric's exposure to illicit drugs in utero caused his NAS symptoms

14

and indicated Tammy's usage of cocaine within days of Eric's birth. And, Tammy did not dispute ingesting cocaine during her pregnancy.

We conclude the judge did not shift the burden of proof to Tammy. The judge correctly determined that the Division had proven the elements of abuse or neglect under Title 9 by a preponderance of the evidence. The record contains ample credible evidence that Tammy abused (or, alternatively, neglected) Eric by ingesting cocaine during her pregnancy. There is sufficient evidence that her misuse of cocaine was a causal factor in Eric's NAS condition, which resulted in him being hospitalized for five days and being administered morphine before he was discharged. "If an expectant mother's drug use causes actual harm to the physical, mental, or emotional condition of a newborn child, a finding of abuse or neglect is appropriate." A.L., 213 N.J. at 8.

B.

Next, Tammy argues the judge erred in admitting embedded hearsay contained within the JRMC and hospital records. Tammy acknowledges the judge correctly determined these records qualified as business records under N.J.R.E. 803(c)(6), but asserts the Labcorp results contained in those records regarding her drug screens were not identified within JRMC's printouts and not separately certified to by Labcorp. First, Tammy contends the Labcorp test

results were not properly authenticated, no foundation was laid to establish chain of custody within Labcorp, and Dr. Vuittonet's testimony that ". . . the screen comes right back from Labcorp, goes directly into their system" and "cannot be edited by anyone in [JRMC,]" was insufficient to establish authentication. Second, Tammy argues the NAS scores in the hospital records of "eleven and thirteen" and diagnosing Eric with NAS should have been excluded. Tammy claims the hospital records admitted into evidence started at the point when Eric was two days old on May 19, 2022, and therefore, the judge was unable to properly evaluate the high Finnegan scores, which were used to establish the NAS diagnosis. Tammy avers that "all babies have irritable moments" and they "cry and can [be] inconsolable."

Title 9 authorizes the admission of certain types of evidence at an abuse-or-neglect fact-finding hearing. For instance, N.J.S.A. 9:6-8.46(a)(3) provides in relevant part that in a Title 9 hearing,

> any writing, record or photograph, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or

> agency, and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter, shall be prima facie evidence of the facts contained in such certification.
>
> [N.J.S.A. 9:6-8.46(a)(3) (emphasis added).]

A writing or record satisfies the regular-course-of-business requirement of N.J.R.E. 808 if it satisfies the business-records exception, N.J.R.E. 803(c)(6), to the hearsay rule, N.J.R.E. 802. N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 494 (App. Div. 2016). N.J.R.E. 803(c)(6) states:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to [N.J.R.E.] 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or other record.

"This exception does not apply if the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy." Ibid.

Similarly, Rule 5:12-4(d) provides that Division "reports by staff personnel or professional consultants," shall be admitted into evidence "pursuant to N.J.R.E. 803(c)(6) and 801(d)," and "[c]onclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal."

17

However, "[e]xpert diagnoses and opinions in a Division report are inadmissible hearsay, unless the trial court specifically finds they are trustworthy under the criteria in N.J.R.E. 808, including that they are not too complex for admission without the expert testifying subject to cross-examination." N.T., 445 N.J. Super. at 487. Diagnoses and opinions of a medical-services provider in a record or report also constitute inadmissible hearsay, id. at 500, unless they are included in business records under N.J.R.E. 806(c)(6) and satisfy the requirements of N.J.R.E. 808, which provides:

> Expert opinion that is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the court finds that the circumstances involved in rendering the opinion tend to establish its trustworthiness. Factors to consider include the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion.

This court has held that "when the expert is not produced as a witness, [N.J.R.E. 808] requires the exclusion of his or her expert opinion, even if contained in a business record, unless the trial judge makes specific findings regarding trustworthiness." N.J. Div. of Youth & Fam. Servs. v. M.G., 427 N.J. Super. 154, 174 (App. Div. 2012). Moreover, "[a]n expert medical opinion contained in a report is generally inadmissible under [N.J.R.E. 808's] test

18

because of the complexity of the analysis involved in arriving at the opinion and the consequent need for the other party to have an opportunity to cross-examine the expert." N.T., 445 N.J. Super. at 501 (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. B.M., 413 N.J. Super. 118, 130 (App. Div. 2010)).

Division reports are generally admissible under the business-record exception to hearsay. See id. at 493-96. Because "requiring all [Division] personnel having contact with a particular case to give live testimony on all the matters within their personal knowledge would cause an intolerable disruption . . . it becomes necessary to allow certain evidence to be produced in a hearsay form[.]" Id. at 496 (first and third alterations in original) (quoting In re Guardianship of Cope, 106 N.J. Super. 336, 343 (App. Div. 1969)).

Therefore, statements to the report's author "by [Division] 'staff personnel (or affiliated medical, psychiatric, or psychological consultants), [made based on] their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate, and in the usual course of their duties with the' [Division]" are admissible. Ibid. (alterations in original) (quoting Cope, 106 N.J. Super. at 343); see also Hahnemann Univ. Hosp. v. Dudnick, 292 N.J. Super. 11, 17-18 (App. Div. 1996) (finding "the foundation

19

witness generally is not required to have personal knowledge of the facts contained in the record").

However, hearsay embedded in Division records must satisfy a separate hearsay exception. See N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 466-67 (App. Div. 2014). But, where "objectionable hearsay is admitted in a bench trial without objection," it is "presume[d] that the fact-finder appreciates the potential weakness of such proofs, and takes that into account in weighing the evidence." N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016). "[A]n appellant faces an especially high hurdle in an appeal . . . to establish that the admission of such evidence constitutes 'plain error.'" Ibid. (citing R. 2:10-2).

The JRMC record—which incorporated the Labcorp results—was admissible under N.J.R.E. 803(c)(6) because it was a record made in the regular course of business, and it was the regular practice of that business to make such a writing or other record. The judge reasonably found the JRMC records were trustworthy after Dr. Vuittonet testified to their reliability. Dr. Vuittonet clearly testified that after a patient submits a sample to JRMC, the sample is tested by JRMC and then it is sent to Labcorp to confirm the results. Labcorp sends the results back, and the information is documented in the record. We conclude the

judge did not abuse her discretion in admitting the JRMC records under N.J.R.E. 803(c)(6).

Regarding the hospital records, the judge appropriately noted there was an objection as to "best evidence" because only the discharge records and an abstract of Eric's hospital records were moved into evidence, which did not include all of the hospital staff's interactions with Eric. The judge emphasized the hospital records presented were certified, and Dr. Puvabanditsin testified about how the records are kept by the hospital. The judge pointed out that the Finnegan scores were done by the nurses who monitored Eric and documented in the record. Dr. Puvabanditsin did not perform the Finnegan score testing himself, but he testified as to this information, which he obtained from the nurses. The judge noted that the hospital routinely conducts urine and meconium screens, which are entered into a patient's chart.

The judge did not misuse this evidence under N.J.R.E. 803(c)(6). The hospital records were properly authenticated and admitted as business records, and the Finnegan scores included within those records formed the basis for Dr. Puvabanditsin's NAS diagnosis. We reject Tammy's argument that each nurse who conducted the Finnegan scoring was required to testify.

A-1439-23

Tammy also challenges the judge's ruling that the Finnegan score is not a complex medical diagnosis and is subject to N.J.R.E. 808. We disagree. The hospital records were created "in the regular course of business" based on Dr. Puvabanditsin's testimony. Further, the Finnegan scores were not "[e]xpert diagnoses and opinions in a Division report," which would require an expert to testify on those results behalf. N.T., 445 N.J. Super. at 487. Dr. Puvabanditsin testified as to his own independent observations of Eric's NAS symptoms—excessive crying, irritability, not eating, and tremors—in conjunction with Tammy's history of drug use, and the positive urine and meconium screens, in rendering Eric's NAS diagnosis. Moreover, there is no evidence in the record challenging Dr. Puvabanditsin's evaluation, diagnosis, or treatment of Eric's NAS. The judge's findings are supported by the evidence.

C.

Finally, Tammy argues Dr. Puvabanditsin did not provide a sufficient basis for his NAS diagnosis and thereby rendered a net opinion. Tammy contends NAS is a "complex diagnosis" and includes "a wide constellation of signs and symptoms involving multiple systems," which require "expert interpretation."

22

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 54-55 (2015) 43 (alterations in original) (quoting State v. Townsend, 186 N.J. 473, 494 (2006)).  Under the rule, "an expert's bare conclusions, unsupported by factual evidence, [are] inadmissible." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (alteration in original) (quoting Buckelew v. Grossbard, 87 N.J. 512, 524 (1981)).  To avoid a net opinion, the expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Pierre, 221 N.J. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

Here Dr. Puvabanditsin's opinion was supported by his personal observations of Eric—as an expert in neonatology—and the Finnegan scores. Dr. Puvabanditsin's uncontroverted testimony established that Eric, "like most babies born with NAS," took nearly forty-eight hours to exhibit withdrawal symptoms because he had been constantly ingesting the drug in utero during Tammy's pregnancy.  Dr. Puvabanditsin explained that a newborn starts to exhibit withdrawal symptoms once separated from the mother for a twenty-four to forty-eight-hour period.  If morphine had not been administered to Eric, Dr.

Puvabanditsin testified that Eric may have "stopped eating, sleeping, and started experiencing seizures." After several days of treatment, Dr. Puvabanditsin stated Eric started taking formula, sleeping, and that his Finnegan scores lowered.

The judge noted Dr. Puvabanditsin has been working with sick newborns "for nearly [forty] years" and "reliably" testified about Eric's condition based on both the doctor's personal observations, hospital record, and the admissions made by Tammy that she gave to the hospital staff. We are satisfied Dr. Puvabanditsin gave the "why and wherefore" that supports his opinion and not a mere conclusion. Pierre, 221 N.J. at 54 (quoting Borough of Saddle River, 216 N.J. at 155 ). Thus, Dr. Puvabanditsin's opinion was not a net opinion, and the judge did not abuse her discretion in relying on his NAS diagnosis of Eric.

To the extent that we have not addressed them, all other arguments raised by Tammy lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

24                                                        A-1439-23