MARGO ROMAN *vs.* TRUSTEES OF TUFTS COLLEGE & others.[1]

Worcester. May 3, 2011. - March 21, 2012.

Present: IRELAND, C.J., SPINA, GANTS, DUFFLY, & LENK, JJ.

*Massachusetts Civil Rights Act. Constitutional Law,* Freedom of speech and press. *Civil Rights,* Availability of remedy. *Emotional Distress. Negligence,* Standard of care. *Veterinarian. Practice, Civil,* Civil rights, Summary judgment.

Discussion of the standard of review applicable to a grant of summary judgment. [710-711]

In a civil action, the judge properly granted summary judgment in favor of the defendants on the plaintiff's claim of violations of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H and 11I (act), where, even assuming that the plaintiff had a right, secured by the First Amendment to the United States Constitution or art. 16 of the Massachusetts Declaration of Rights, to attend a lecture, open to the public, that was held on the campus of the defendant university, and assuming that, in advertising and conducting that lecture the university created in its lecture hall a situation akin to a limited public forum, the exclusion of the plaintiff from the lecture by one of the university's employees did not interfere with the plaintiff's free speech rights for purposes of the act, in that the policy underlying the exclusion from the lecture was reasonable and both content- and viewpoint-neutral, and in that the information disseminated at the lecture was available to the plaintiff through other means and she could have posed any questions she had to the lecturer outside the lecture forum. [711-717]

In a civil action alleging intentional infliction of emotional distress, the judge properly granted summary judgment in favor of the defendants, where, as a matter of law, the defendants' alleged conduct was not extreme and outrageous. [717-718]

In a civil action alleging negligence arising from the treatment of the plaintiff's horse, the judge properly granted summary judgment in favor of the defendants, where, even if the plaintiff had demonstrated that the provided care deviated from the reasonable standard of care within the veterinary profession, she failed to establish a resulting harm from any such deviation. [718-719]

CIVIL ACTION commenced in the Superior Court Department on January 29, 2007.

The case was heard by *Mitchell H. Kaplan,* J., on a motion for summary judgment.

[1]Steven L. Rowell, Isabel R. Jurk, and Susan Brogan.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John J. Finn* (*Michael A. Finn* with him) for the plaintiff.

*Scott P. Lewis* (*Dickens Mathieu* with him) for the defendants.

*David Himelfarb* & *John Reinstein,* for American Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

*Alan D. Rose* & *Lisa A. Tenerowicz,* for Babson College & others, amici curiae, submitted a brief.

DUFFLY, J. The plaintiff, Margo Roman, appeals from a Superior Court judge's order granting the defendants' motion for summary judgment on her complaint alleging violations of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H and 11I (act).[2],[3] Roman contends that she had a right, secured by the First Amendment to the United States Constitution and by art. 16 of the Massachusetts Declaration of Rights, to attend a lecture that was open to the public and held on the campus of the defendant Tufts,[4] and that Tufts and defendant Susan Brogan violated the act when they excluded Roman from the lecture. We conclude that the circumstances of Roman's exclusion from the lecture did not amount to an interference with any claimed free speech right, and thus that the allowance of summary judgment on this claim was proper. We conclude also that the allowance of summary judgment for the defendants on Roman's claims of intentional infliction of emotional distress and negligence was correct.

*Background.* We summarize the undisputed facts drawn from the summary judgment record. Roman is a veterinarian with a private practice focused on integrative medicine, a specialty that combines conventional veterinary medicine with alternative

[2]We acknowledge the amicus brief of the American Civil Liberties Union of Massachusetts in support of the plaintiff, and the brief of amici curiae Babson College, Bentley University, Boston College, Boston University, Brandeis University, Emerson College, Regis College, Simmons College, Stonehill College, Suffolk University, and Williams College in support of the defendants.

[3]The plaintiff appeals also from the allowance of summary judgment on her claims for intentional infliction of emotional distress and negligence.

[4]For simplicity, we refer to the Trustees of Tufts College, Tufts University, and the Cummings School of Veterinary Medicine at Tufts University in Grafton as Tufts.

treatments such as holistic medicine, homeopathy, and herbal remedies. In 1997, Roman discovered a small lesion on the third eyelid[5] of her horse, Champ, that she diagnosed as either a benign sarcoid tumor or a malignant squamous cell carcinoma. She treated the lesion with a variety of alternative therapies. By January, 2004, the lesion had grown, and Champ's entire eye had become painful and infected. Roman contacted defendant Isabel Jurk, a veterinary ophthalmologist at Tufts, seeking surgical removal of the eye.

Roman brought Champ to Tufts on January 30, 2004. Jurk diagnosed Champ's lesion as an invasive squamous cell carcinoma that had metastasized. She conferred with defendant Stephen Rowell, the hospital director at Tufts, who agreed with Jurk's preliminary diagnosis and her medical determination that surgery was not appropriate for Champ at that time. Rowell and Jurk met with Roman to provide their preliminary diagnosis and to seek permission to conduct a biopsy. At this meeting, Rowell and Jurk expressed concern over Champ's condition, and discussed the possibility of palliative euthanasia. They also expressed concern about the quality of Roman's care for Champ and whether Roman's integrative medicine practice and treatments fell below accepted standards of veterinary care. Roman rejected the recommendation of palliative euthanasia and ultimately removed Champ from the hospital.[6]

In the months that followed, Roman refused to pay Tufts for the services rendered to Champ. On December 14, 2004, Rowell sent Roman a letter stating, in relevant part:

> "Until and unless this debt is resolved, you will be unable to obtain any medical or other services through the School. This will include any treatment for your own animals, continuing education, or any other service that the School might provide to you personally."

On May 17, 2005, Tufts, through its office of continuing

[5]The third eyelid, or nictitating membrane, is a transparent inner eyelid present in some animals that helps protect and moisten the eye. See Webster's Third New Int'l Dictionary 1526 (1993).

[6]According to the complaint, Champ's eye was removed in May, 2004, by another veterinarian; Champ lived until July, 2006.

education, presented a publicly advertised lecture on its campus entitled, "Dangers of Feeding Your Pet a Raw Diet."[7] Roman, who is an advocate of raw food diets for animals, sought to attend the lecture; at the time, she still had not paid her bill for services rendered to Champ. When Roman arrived at the lecture hall, Brogan, Tufts's assistant director of continuing education, recognized her. Brogan had had at least one prior conversation with Rowell in which Rowell informed Brogan that Roman was ineligible for continuing education services at Tufts and could not attend the lecture.[8] Standing outside the lecture hall, Brogan told Roman, "you can't come in here," and, "[i]f you come in here, we'll have you arrested." Roman then approached a Tufts police officer, who stated, "if [Brogan] says that I'm to arrest you, then I will arrest you," and, "[i]f you don't leave the building now, I'm going to arrest you." At that point, no other reason was provided to Roman for her exclusion from the lecture. Roman ultimately left the Tufts campus.

Roman filed a complaint in the Superior Court contending that the May 17, 2005, lecture was open to the public, that she had a constitutional right to attend, and that the actions of the defendants in excluding her from the lecture constituted "threats, intimidation or coercion" in violation of G. L. c. 12, § 11H. In addition, the complaint asserted claims for defamation, breach of contract, intentional infliction of emotional distress, and negligence in the defendants' treatment of Champ. A Superior Court judge allowed the defendants' motion for summary judgment on all counts. Roman appealed from the allowance of summary judgment on her claims of civil rights violations, intentional infliction of emotional distress, and negligence. We transferred the case to this court on our own motion.

*Discussion.* 1. *Standard of review.* "The standard of review of a grant of summary judgment is whether, viewing the evidence in

[7]The lecture was advertised in fliers containing a telephone number for the office of continuing education. According to her deposition testimony, Roman called the telephone number listed on the flier and spoke to an unidentified woman. In response to Roman's inquiry, the woman stated that the lecture was open to the general public and that no continuing education credits would be given for it.

[8]Both Brogan and Rowell knew that Roman was an advocate of raw food diets and that she might have an interest in attending the lecture.

the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Kennie* v. *Natural Resource Dep't of Dennis*, 451 Mass. 754, 759 (2008), quoting *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). A nonmoving party's failure to establish an essential element of her claim "renders all other facts immaterial" and mandates summary judgment in favor of the moving party. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711 (1991), citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). See Mass. R. Civ. P. 56(c), as amended, 436 Mass. 1404 (2002). Our review is de novo, *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997), and we may affirm the judgment on any ground supported by the record. See *Foster* v. *Group Health Inc.*, 444 Mass. 668, 672 (2005).

2. *Claims under the act.* In order to establish a claim under the act, Roman "must prove that (1) [her] exercise [or] enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." *Kennie* v. *Natural Resource Dep't of Dennis*, *supra*, quoting *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 644 (2003).

Roman maintains that the defendants' actions in excluding her from the lecture on May 17, 2005, interfered with rights secured by the First Amendment ("Congress shall make no law . . . abridging the freedom of speech") and art. 16 ("[t]he right of free speech shall not be abridged"), and that this interference was by "threats, intimidation or coercion" and therefore a violation of the act.[9] We address first whether Roman's claim meets

---

[9]General Laws c. 12, § 11H, defines violations as occurring

> "[w]henever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth . . . ."

General Laws c. 12, § 11I, permits the filing of a civil action for compensatory damages, or injunctive or equitable relief by

> "[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the

the threshold requirement that the asserted free speech rights be "secured by" the Constitution of the United States or the Massachusetts Declaration of Rights.

We observe that the nature of the asserted free speech right is itself unclear. In her memorandum of law opposing the defendants' motion for summary judgment, Roman focused on a right to attend the lecture and possibly participate in the question-and-answer period that was to follow. During the hearing on that motion, Roman argued that her claim encompassed a right to attend the lecture and receive speech, separate from the potential opportunity to speak during the question-and-answer session; the judge denied Roman's motion to supplement her memorandum to reflect this argument. In her briefs to this court, Roman limits her asserted right to that of attending the lecture, which she characterizes as an independent right to receive speech. Although the defendants argue that Roman has waived any claim involving a right to receive information, attendance at the lecture is necessary in order to possibly be called on in a question-and-answer session. Thus, we consider Roman's claim as encompassing an asserted right to attend a lecture on Tufts's private property to which the public was invited.

It is well established that the First Amendment protects speech rights only against government infringement. *Commonwealth* v. *Hood*, 389 Mass. 581, 584 (1983). Except where a private property owner's activities rise to the level of State action, the First Amendment does not prohibit speech limitations by an owner of private property, even where that property is open to the public, such as a shopping mall that serves the same purposes as a city business district. See, e.g., *Hudgens* v. *National Labor Relations Bd.*, 424 U.S. 507, 519 (1976); *Lloyd Corp.* v. *Tanner*, 407 U.S. 551, 567 (1972); *Marsh* v. *Alabama*, 326 U.S. 501, 508-509 (1946). See also *PruneYard Shopping Ctr.* v. *Robins*, 447 U.S. 74, 81 (1980), quoting *Lloyd Corp.* v. *Tanner, supra* at 569 (1972) ("property does not 'lose its private character merely because the public is generally invited to use it for designated purposes' "). However, it is also well established that State Constitutions may protect individual liberties with rights that

constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H . . . ."

are "more expansive than those conferred by the Federal Constitution." *PruneYard Shopping Ctr.* v. *Robins, supra.*

Although in many circumstances we have interpreted the rights guaranteed by art. 16 as being coextensive with the First Amendment, see, e.g., *Opinion of the Justices*, 430 Mass. 1205, 1209 n.3 (2000), citing *Walker* v. *Georgetown Hous. Auth.*, 424 Mass. 671, 674 (1997), and *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 558 (1979), we have rejected the assertion that art. 16 can "extend no further than the comparable provisions of the First Amendment." *Batchelder* v. *Allied Stores Int'l, Inc.*, 388 Mass. 83, 89 n.8 (1983), *S.C.*, 393 Mass. 319 (1985), quoting *Commonwealth* v. *Noffke*, 376 Mass. 127, 134 (1978). Moreover, we have cited with approval cases in other jurisdictions where courts have concluded that their State Constitutions protect the exercise of free speech rights on private university property against private actors. *Batchelder* v. *Allied Stores Int'l, Inc., supra* at 90-91 (discussing *State* v. *Schmid*, 84 N.J. 535 [1980], appeal dismissed sub nom. *Princeton Univ.* v. *Schmid*, 455 U.S. 100 [1982], and *Commonwealth* v. *Tate*, 495 Pa. 158, 173 [1981]). Nonetheless, we have left open the question — and expressed caution in addressing — whether art. 16 itself extends to speech on private property, *id.* at 88-89, 91-92, as such an interpretation necessarily limits to some degree the property or free speech rights of the property owner.

We need not resolve the question in this case. Even if we were to conclude that protections of art. 16 extend to actions of private individuals, any restriction on a private actor's ability to limit a person's free speech rights would necessarily be no more extensive than the restrictions imposed on government actors. Because we conclude that a government actor could not be said to have "interfered with" Roman's purported free speech right in these circumstances, it follows that the conduct of Tufts, a private actor, likewise did not interfere with any such right.

To address the exercise of First Amendment speech rights on government property, the United States Supreme Court has developed the public forum doctrine. "[T]he extent to which the Government may limit access [to those seeking to exercise protected speech in a particular forum on government property] depends on whether the forum is public or nonpublic." *Cornelius*

v. *NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797
(1985). In a nonpublic forum, restrictions need only be "reason-
able and . . . not an effort to suppress expression merely because
public officials oppose the speaker's view." *Id.* at 800, quoting
*Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37,
46 (1983). Where the forum is public, the extent to which the
government may permissibly limit speech depends on the nature
of the property and the extent to which the public has been given
access to the forum. See *Christian Legal Soc'y Chapter of the
Univ. of Cal., Hastings College of the Law* v. *Martinez*, 130
S. Ct. 2971, 2984 n.11 (2010) (*Christian Legal Society*).

Under First Amendment jurisprudence, there are three
categories of public forums: traditional public forums, such as
public streets and parks; designated public forums, which the
government has opened for use by the public as a place to as-
semble or debate; and limited public forums, which are "limited
to use by certain groups or dedicated solely to the discussion of
certain subjects." *Pleasant Grove City* v. *Summum*, 555 U.S.
460, 470 (2009). In traditional or designated public forums, the
government may impose reasonable time, place, and manner
restrictions on the exercise of free speech rights, but any such
restriction must be narrowly tailored to serve a compelling
government interest. *Id.* at 469. In a limited public forum,
however, regulations need only be "reasonable and viewpoint
neutral."[10] *Id.* at 470.

Had the lecture at issue here occurred on public property,
Roman's claim of access could have been no greater than to
that of a limited public forum. Although Tufts advertised the

---

[10]In the context of private property, a public forum analysis would also
have to balance the competing constitutional interests involving the property,
liberty, and speech interests of the property owner on the one hand, and the
free speech and related rights of those seeking access to the property or forum
on the other. Cf. *State* v. *Schmid*, 84 N.J. 535, 563-564 (1980), appeal dismissed
sub nom. *Princeton Univ.* v. *Schmid*, 455 U.S. 100 (1982) (establishing test
under State Constitution, grounded in Federal public forum analysis, which
balances factors such as nature of private property, extent of public invitation,
and purpose for which expressive activity is undertaken; and deciding that
public presence within university is consonant with university's expressed
educational mission); *Commonwealth* v. *Tate*, 495 Pa. 158, 173 (1981) (setting
forth test under State Constitution, based on Federal public forum framework,
that balances private property rights with speech rights "in light of the compat-
ibility of that expression" with given forum).

lecture on its Web site, in newspapers, and in fliers placed in local stores as being open to the public and free of charge, the scope of the invitation was quite plainly "dedicated solely to the discussion of certain subjects." *Id.*

In a limited public forum, "a less restrictive level of scrutiny [is applied than in a traditional public forum]"; restrictions on speech need only be reasonable and neutral as to content and viewpoint. *Christian Legal Society, supra* at 2984 n.11, 2985, 2993-2994. A policy or regulation that limits expression is deemed viewpoint neutral if it "serves purposes unrelated to the content of expression . . . , even if it has an incidental effect on some speakers or messages but not others." *Id.* at 2994, quoting *Ward* v. *Rock Against Racism,* 491 U.S. 781, 791 (1989). Moreover, restrictions on access to a limited public forum "need not be the most reasonable or the only reasonable limitation." *Id.* at 2992, quoting *Cornelius* v. *NAACP Legal Defense and Educ. Fund, Inc., supra* at 808. Indeed, a "defining characteristic" of a limited public forum is that the forum may be reserved "for certain groups." See *id.* at 2985, quoting *Rosenberger* v. *Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995). The reasonableness of a given limitation may be gauged in part by the alternatives that remain available for exercising free speech. See *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n, supra* at 53-54.

Under this analysis, Roman has not established on the summary judgment record that Tufts excluded her from the May 17 lecture based on a policy that was not reasonable and that was not content- and viewpoint-neutral. It is undisputed that, after Roman obtained veterinarian services at Tufts for her horse, she did not pay her bill, and that Tufts sent her a letter, which she received, advising her that "[u]ntil and unless" her debt to Tufts was resolved, she would be "unable to obtain any medical or other services through [Tufts]," including "continuing education, or any other service." The policy expressed in this letter was clear and reasonable: Tufts conditioned the continued utilization of services and access to its facilities, including participation in continuing education offerings and attendance at lectures, on the payment in full of Roman's outstanding obligations for services rendered by Tufts.[11] The policy was also

---

[11]Roman suggests that the scope of the exclusionary policy is in fact unclear

content- and viewpoint-neutral. "It [did] not reflect a judgment by school officials about the substance of any [person's] speech. Nor [did] it exclude any [people] on the basis of their convictions." See *Christian Legal Society, supra* at 2996 (Stevens, J., concurring). The restriction imposed by Tufts served its interest in fiscal integrity and was unrelated to the content of Roman's speech. See *id.* at 2994, citing *Ward* v. *Rock Against Racism, supra* at 791.

Roman suggests that, in deciding to exclude her from the lecture, the defendants were motivated impermissibly by personal animus toward her, or because they disagreed with her views on integrative medicine and raw food diets. The personal views of the defendants have no impact on the question whether the policy itself was content- and viewpoint-neutral. To the extent that Roman is claiming that the facially-neutral policy was invoked only to exclude those sharing her views, but not invoked against debtor clients whose views were consistent with those presented at the lecture, she has offered no evidence that anyone else with an outstanding and overdue debt attended or sought to attend the lecture.[12]

Moreover, Roman has not established that Tufts's content-neutral policy created an unreasonable restriction on the free speech rights she asserts. To the extent that Roman sought only to receive the information being disseminated at the lecture, she does not argue that the information was unavailable through alternative means, such as articles in print or available over the Internet, attendance at lectures on other campuses, or direct communication with the speaker. See *Christian Legal Society, supra* at 2991 (public law school's policy limiting official recognition to student organizations that did not discriminate was reasonable restriction on access to limited public forum, where other

and that, therefore, a material dispute of fact exists as to the nature of the policy. She bases this assertion in part on evidence that when she placed a telephone call to the office of continuing education, someone there confirmed that the lecture was open to the public free of charge, and that no credits were being offered. Roman's solicitation of this information did not address the scope of her exclusion from Tufts's services.

[12]The closest the record comes to establishing a discriminatory application of the neutral policy is Rowell's deposition testimony stating that "[Tufts] had not made any specific prohibition to anyone else that they couldn't receive continuing education or other services."

available avenues, including electronic media and social network-ing Web sites, were available for exercise of First Amendment rights); *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n, supra* at 53-54 (restrictions on school mail system reasonable where union had other means, such as bulletin boards, to communicate with teachers); *Greer* v. *Spock,* 424 U.S. 828, 839 (1976) (Federal military reservation regulations banning partisan political speeches did not impermissibly infringe rights of Armed Forces members, who were free as individuals to attend political rallies out of uniform and off base). Similarly, to the extent Roman sought to participate in the question-and-answer period, had she been called on, she could have posed her questions directly to the speaker, a Tufts professor, outside the forum in which that particular lecture was held. See *Pell* v. *Procunier,* 417 U.S. 817, 827-828 (1974) (regulation limiting media access to prison inmates did not unconstitutionally infringe prisoners' First Amendment rights because alternative means of communication were available by mail and through visitors).

Therefore, even assuming that Roman had a free speech right "secured" under art. 16 and enforceable under the act against Tufts, and that, in advertising and conducting its lecture on raw foods, Tufts did create in its lecture hall a situation akin to a limited public forum, our conclusion that Tufts excluded Roman from the lecture on a permissible basis necessarily forecloses Roman's claim that any asserted speech right was "interfered with" for purposes of the act. Since Roman cannot establish an essential element of her claim, the judge did not err in allowing summary judgment for the defendants.

3. *Intentional infliction of emotional distress.* Roman argues that the motion judge erred in concluding that the individual named defendants' conduct at Tufts on January 30, 2004, and at the lecture on May 17, 2005, was, as a matter of law, not extreme and outrageous. There was no error.

"To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe

distress." *Sena* v. *Commonwealth*, 417 Mass. 250, 263-264 (1994), citing *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976). Liability for "extreme and outrageous" conduct "cannot be predicated upon 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,' nor even is it enough 'that the defendant . . . has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort'; rather, '[l]iability [may be] found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 99.(1987), quoting Restatement (Second) of Torts § 46 comment d (1965).

"In considering whether a plaintiff has made out a claim for intentional infliction of emotional distress, we have said that the trier of fact 'would be entitled to put as harsh a face on the [defendant's actions] as the basic facts would reasonably allow.' " *Id.* at 100, quoting *Richey* v. *American Auto. Ass'n*, 380 Mass. 835, 839 (1980). Even when considered in this light, however, the record here would not permit a reasonable jury to find that the defendants' conduct was extreme and outrageous. Roman's claims as to the defendants' actions on January 30, 2004, at most involve their accusations of "cruelty" and "malpractice," cursing, and an order to "shut up," as well as "eye rolling" and statements that were generally dismissive of Roman's integrative veterinary practices. Such conduct falls within the realm of "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" that fail to "go beyond all possible bounds of decency." *Id.* at 99.

Similarly, nothing in the summary judgment record suggests that Brogan did more than tell Roman to vacate the Tufts premises on the night of the May 17, 2005, lecture, and state that if Roman did not comply, she would be arrested. Brogan's conduct does not approach the type of behavior that could be considered "extreme and outrageous." See *Sena* v. *Commonwealth*, *supra* at 263-264.

*4. Negligence.* Roman asserted claims of negligence against

defendants Jurk, Rowell, and Tufts[13] for their failure to perform surgery on Champ on January 30, 2004. To prove that a veterinarian was negligent in the care provided, a plaintiff must show that such care deviated from the reasonable standard of care within the profession. See *Kippenberger* v. *Board of Reg. in Veterinary Med.*, 448 Mass. 1035, 1036 (2007); *Fitzgerald* v. *Board of Reg. in Veterinary Med.*, 399 Mass. 901, 904-905 (1987). Even if Roman could surmount this hurdle, she was required also to show a resulting harm from any such deviation; on this record, she has failed to establish any harm. Roman remained free to, and did, take Champ to another veterinarian to pursue the course of treatment she believed most appropriate.

*Judgment affirmed.*

---

[13]It appears that the claim of negligence against Tufts was brought under a theory of traditional respondeat superior liability. See *Dias* v. *Brigham Med. Assoc., Inc.*, 438 Mass. 317, 318-322 (2002).