# United States Court of Appeals
## For the First Circuit

No. 24-1832

J.S.H., in her individual capacity, and as legal guardian and on
behalf of a minor child known as G.H.,

Plaintiff, Appellant,

v.

ALICE NEWTON; MASSACHUSETTS GENERAL HOSPITAL,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Margaret R. Guzman, U.S. District Judge]

Before

Montecalvo, Kayatta, and Rikelman,
Circuit Judges.

Luke Rosseel, with whom Rosseel Law, John T. Martin, Michaela
Weaver, and Sullivan & Sullivan, LLP were on brief, for appellant.

Christine D. Cooledge, with whom John D. Cassidy, Madeline P.
Poole, and Ficksman & Conley, LLP were on brief, for appellee Alice
Newton.

Emily A. Moellers, with whom Daniel E. Murphy and Faggiano &
Associates, P.C. were on brief, for appellee Massachusetts General
Hospital.

January 14, 2026

**RIKELMAN, <u>Circuit Judge</u>.** This tragic case concerns G.H., a child who suffered from debilitating medical conditions that required extensive treatment throughout his short life. During G.H.'s treatment in 2018, Dr. Alice Newton, a specialist at Massachusetts General Hospital (MGH), reported suspected medical child abuse of G.H. by his mother, J.S.H. After an investigation, that report was deemed unsubstantiated. Several years later, J.S.H. filed this lawsuit against Dr. Newton and MGH, bringing state-law emotional distress claims and federal claims, including a disability discrimination claim against MGH under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). The district court granted summary judgment to Dr. Newton and MGH, concluding that J.S.H. had failed to offer enough facts to send the case to trial. We agree with the district court's ruling and thus affirm.

## I. BACKGROUND

### A. Relevant Facts[1]

In 2011, J.S.H.'s daughter died at the age of four from a mitochondrial disorder, a long-term, often genetic disorder that adversely affects the body's mitochondria but is difficult to

---

[1] In reviewing the district court's summary judgment ruling, we recount the facts in the record in the light most favorable to J.S.H. and G.H., drawing all reasonable inferences in their favor. <u>See</u> <u>Appleton</u> v. <u>Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 145 F.4th 177, 181 (1st Cir. 2025) (citing <u>Sutherland</u> v. <u>Peterson's Oil Serv., Inc.</u>, 126 F.4th 728, 734 (1st Cir. 2025)).

diagnose.[2]  Her daughter had been receiving treatment at Boston Children's Hospital, and because of the "complex and frustrating nature" of the disorder, the hospital conducted an internal ethics review to evaluate the parents' and medical team's actions.  In the end, the ethics review concluded that both the parents and medical team had acted appropriately.

Shortly after J.S.H.'s daughter died, her son, G.H., also began exhibiting concerning health symptoms, and the family once again sought care at Boston Children's Hospital.  Among other symptoms, G.H. had poor muscle tone and needed medical assistance to oxygenate and receive nourishment.  As a result, G.H. required extensive, ongoing treatment and specialized services from a team of highly skilled medical providers.  His clinical team came to suspect that he, like his sister, suffered from a mitochondrial disorder.  G.H. continued to suffer from this "complex constellation of multi-systemic symptoms" for most of his life.  Ultimately, there was "no unifying or confirmed diagnosis" that fully explained his condition.

When G.H. began treatment at Boston Children's Hospital, Dr. Newton was the head of the hospital's child protection team.  In that role, she became familiar with both G.H. and J.S.H.

---

[2] J.S.H. relies on and cites to allegations in the amended complaint in setting out certain background facts.  We recite these facts as if they were part of the summary judgment record, given that the defendants do not dispute them.

Dr. Newton's position at Boston Children's Hospital rendered her a "mandated reporter" of suspected child abuse under Massachusetts law.  Mass. Gen. Laws ch. 119, § 51A(a).  As a mandated reporter, she was legally obligated to file a "51A report" with the Massachusetts Department of Children and Families (DCF) if she had "reasonable cause to believe that a child [was] suffering physical or emotional injury resulting from . . . abuse inflicted upon him which cause[d] harm or substantial risk of harm to the child's health or welfare."[3]  Id.

In November 2011, Dr. Newton filed a 51A report about G.H. with DCF, alleging medical child abuse[4] based on her suspicion that J.S.H. had been misrepresenting G.H.'s health status to his pediatrician.  As grounds for the report, Dr. Newton cited what she viewed as inconsistencies between J.S.H.'s descriptions of G.H.'s health and G.H.'s behavior and level of functioning during

---

[3] We cite to the language of the statute as it existed at the time of the relevant events in this case.

[4] Medical child abuse, also known as "Munchausen syndrome by proxy," involves a person, typically a parent, who "fabricates or exaggerates illnesses or physical ailments suffered by another person, typically the child of [that parent]."  In re Adoption of Willamina, 881 N.E.2d 771, 772 n.3 (Mass. App. Ct. 2008).  "Its effect on the cared-for individual results from the obstacles it creates for health care providers striving to identify the cared-for individual's nonexistent illness, thereby making the matter worse."  N.J. Dep't of Child. & Fams. v. L.O., 213 A.3d 187, 189 n.1 (N.J. Super. Ct. App. Div. 2019) (citing medical dictionaries).

his hospital stays.  At the time, G.H. was three years old.  DCF ultimately determined that the report was unsubstantiated.

After Dr. Newton filed the 51A report, J.S.H. switched G.H.'s care from Boston Children's Hospital to Tufts Medical Center.  The parties agree that from 2011 until August 2018, Dr. Newton did not have any contact with J.S.H. or G.H.  Nevertheless, DCF received additional 51A reports about G.H. during that period, although the parties have not pointed to anything in the record that indicates who made such reports.  DCF determined that those additional reports were also unsubstantiated.

In the time period between Dr. Newton's initial 51A report in 2011 and the events that led to this lawsuit, Dr. Newton switched employers.  In 2013, she became the Medical Director of the Child Protection Program at MGH.  The MGH Child Protection Program specializes in identifying and responding to suspected child abuse and provides children's medical providers with information related to suspected child abuse.  In her role at MGH, Dr. Newton continued to be a mandated reporter of suspected child abuse under Massachusetts law.  See id.

In July 2018, J.S.H. was identified as a witness in an unrelated state court trial against Dr. Newton.  According to J.S.H., although she ultimately did not participate in the trial, she intended to testify that Dr. Newton had made unfounded

- 6 -

allegations of child abuse against parents of children with complex medical conditions.[5]

In August 2018, G.H. was receiving treatment from Dr. Susan Goode, a medical provider affiliated with MGH. J.S.H. contends that Dr. Newton contacted Dr. Goode, unprompted, soon after learning that Dr. Goode was treating G.H. Allegedly, this contact came just weeks after J.S.H. was identified as a witness against Dr. Newton. Although Dr. Newton was not part of G.H.'s medical team at the time, she reviewed G.H.'s medical record at MGH that was available to her. In her view, that record reinforced her prior concerns of suspected medical child abuse.

After reviewing G.H.'s medical record at MGH, Dr. Newton documented her findings, as well as her renewed concerns of medical child abuse, in G.H.'s MGH medical chart. She then copied G.H.'s known providers on her medical note, dated September 6, 2018, which relayed her suspicions of abuse.[6] In the note, Dr. Newton claimed that J.S.H. had "exaggerated [G.H.'s] symptoms" "[t]hroughout his

_____

[5] The parties dispute whether Dr. Newton was aware that J.S.H. was identified as a witness in the unrelated state court trial before Dr. Newton ultimately filed another 51A report about G.H. in September 2018.

[6] Dr. Newton maintains, but J.S.H. disputes, that Dr. Goode agreed to a consultation by the Child Protection Program at MGH. During discovery, however, Dr. Newton acknowledged that Dr. Goode has subsequently denied requesting any such consultation. Dr. Goode was not deposed and did not submit a declaration in this case.

- 7 -

life" and "sought invasive testing and surgical procedures which were not clearly clinically indicated and which were both painful and harmful."

On September 10, 2018, Dr. Newton filed another 51A report with DCF, again alleging suspected medical child abuse of G.H. An investigation followed, which included home visits with G.H., as well as interviews with J.S.H., Dr. Newton, and G.H.'s MGH medical team, and a review of G.H.'s medical record.

At the end of DCF's investigation, the agency again concluded that the allegations of medical child abuse were unsubstantiated. The final investigative report stated:

> Multiple letters were provided to [DCF] from other medical providers working with the family. Concerns were raised that [Dr. Newton] was filing a report against the family after not being a part of his medical care since 2011.
>
> In speaking with . . . medical doctors, specialist [sic], in home medical providers, therapists and more[,] none reported any concerns for Medical Child Abuse, or even neglect of the child by the parents. All . . . report[] that the mother is appropriate and advocates for her son[']s medical care. [They] expressed significant frustration with [Dr. Newton's] allegations, given that she has not been involved in the child's care for many years. . . .
>
> [T]here are no indications of Medical Child Abuse from any of the medical team. There are currently no concerns for Medical Child Abuse by the parents.

- 8 -

G.H. passed away on May 8, 2024, during the course of this litigation.

## B. Procedural History

J.S.H. filed this lawsuit on behalf of herself and G.H. in 2021. The nine-count amended complaint included both Massachusetts state-law claims and federal claims. In particular, J.S.H. alleged that Dr. Newton's conduct in the summer of 2018, including her medical note to G.H.'s medical providers, caused J.S.H. and G.H. emotional distress and led to a loss of medical treatment by G.H.

After J.S.H. voluntarily dismissed certain claims in the complaint, and the district court granted the defendants' motion to dismiss others, the parties proceeded to discovery on five claims. These included the state-law emotional distress claims against Dr. Newton and the Section 504 disability discrimination claim against MGH.

Before discovery ended, Dr. Newton and MGH moved for summary judgment on the remaining five claims, and the district court granted their motions. As part of her opposition to the motions, J.S.H. submitted an affidavit describing the distress and physical symptoms that she had experienced as a result of Dr. Newton's actions, including "sleeplessness, anxiety, nightmares, fatigue, and headaches on a weekly basis, occurring multiple times a week."

The district court determined that J.S.H. had failed to put forward enough facts to bring the case to a jury. In so ruling, the court declined to consider J.S.H.'s affidavit submitted in opposition to the defendants' summary judgment motions, concluding that it was untimely.

J.S.H. timely appealed. She continues to pursue claims on her own behalf and on behalf of the estate of G.H.

## II. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment to Dr. Newton and MGH, "scrutiniz[ing] the facts in the light most agreeable" to J.S.H. and G.H. as the nonmoving parties and drawing all reasonable inferences in their favor. Cruz-Cedeño v. Vega-Moral, 150 F.4th 1, 5 (1st Cir. 2025) (alteration in original) (quoting Klunder v. Brown Univ., 778 F.3d 24, 30 (1st Cir. 2015)). We are mindful that the role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Burt v. Bd. of Trs. of Univ. of R.I., 84 F.4th 42, 59 (1st Cir. 2023) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). Thus, once Dr. Newton and MGH "start[ed] the ball rolling" by filing properly supported summary judgment motions, J.S.H. was obligated to come forward with enough evidence to support her and G.H.'s claims such that a reasonable factfinder could decide in their favor. Id.

- 10 -

In evaluating the district court's ruling, we may affirm on alternative grounds, including any ground apparent from the record.  See Rodrique v. Hearst Commc'ns, Inc., 126 F.4th 85, 90 (1st Cir. 2025).  Ultimately, we can uphold the grant of summary judgment only if the record "discloses that there is no genuine issue as to any material fact" and Dr. Newton and MGH are "entitled to judgment as a matter of law."  Cruz-Cedeño, 150 F.4th at 5 (quoting Klunder, 778 F.3d at 30).

### III. DISCUSSION

J.S.H. challenges the district court's summary judgment ruling on four claims: her claim for negligent infliction of emotional distress (NIED) against Dr. Newton, both her and G.H.'s claims for intentional infliction of emotional distress (IIED) against Dr. Newton, and G.H.'s Section 504 claim against MGH.[7]  The crux of the parties' dispute is whether J.S.H. and G.H. presented sufficient evidence to withstand summary judgment.  On the record before us, we agree with the district court that they did not.

### A. J.S.H.'s NIED Claim

The district court held that J.S.H. did not put forward enough evidence to create a triable issue on two elements of her

---

[7] J.S.H. does not appeal the district court's ruling rejecting G.H.'s NIED claim.  Rather, she "concedes that there was insufficient evidence of G.H. experiencing physical manifestations of his emotional distress" for this claim to withstand summary judgment.

NIED claim: emotional distress and physical harm.  We affirm the district court's ruling but on the alternative ground urged by Dr. Newton.  We conclude that J.S.H. needed to present expert evidence to prove another element of her NIED claim -- negligence -- but failed to do so.

To recover for NIED under Massachusetts law, J.S.H. needed to "prove '(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.'" Lanier v. President & Fellows of Harvard Coll., 191 N.E.3d 1063, 1072 (Mass. 2022) (quoting Payton v. Abbott Labs., 437 N.E.2d 171, 181 (Mass. 1982)).  To establish the first element, negligence, J.S.H. was required to show that Dr. Newton both "owed a duty" to her and breached that duty by "fail[ing] to exercise reasonable care."  Id. at 1073.

To recap, as a mandated reporter of child abuse under Massachusetts law, Dr. Newton had a legal obligation to file a 51A report with DCF if she reasonably believed that J.S.H. was abusing G.H.  See Mass. Gen. Laws ch. 119, § 51A(a).  At oral argument, J.S.H. conceded that her NIED claim against Dr. Newton would fail if Dr. Newton reasonably concluded that J.S.H. had put G.H. at risk, thus triggering Dr. Newton's duty to report the suspected abuse.  J.S.H. also conceded that a jury might require expert

testimony to determine whether Dr. Newton's medical judgment regarding whether to make a report was reasonable under the circumstances.

We hold that, even if Dr. Newton owed a duty of care to J.S.H., expert testimony was required to establish whether Dr. Newton breached any such duty.  To be sure, as J.S.H. points out, expert medical testimony is generally required for claims of medical negligence that involve a doctor-patient relationship, and there was no such relationship between Dr. Newton and J.S.H.  But Massachusetts law also recognizes that expert testimony may be needed when a jury is required to decide issues outside the ordinary experience of a layperson.  See LeBlanc v. Logan Hilton Joint Venture, 974 N.E.2d 34, 44 (Mass. 2012) ("We generally require expert testimony because 'laymen, including the jury, . . . could not be, and are not, in a position to determine . . . the requirements of professional conduct' in the relevant circumstances." (second omission in original) (quoting Haggerty v. McCarthy, 181 N.E.2d 562, 566 (Mass. 1962))); cf. Silva v. Norfolk & Dedham Mut. Fire Ins. Co., 75 N.E.3d 1132, 1138 (Mass. App. Ct. 2017) ("The test for determining whether a particular matter is a proper one for expert testimony is whether the testimony will assist the jury in understanding issues of fact beyond their common experience." (quoting Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 536 (Mass. 2003))).

Indeed, because all professionals "are expected to exercise 'that skill and judgment which can be reasonably expected from similarly situated'" individuals in their field, "[e]xpert testimony is generally needed to establish th[e] professional standard of care" owed even to "third parties." LeBlanc, 974 N.E.2d at 43-44 (quoting Klein v. Catalano, 437 N.E.2d 514, 525 (Mass. 1982)).

Here, the critical question is whether Dr. Newton acted negligently in submitting a 51A report about G.H. And the answer to that question depends on the standard of care for a mandated reporter of medical child abuse, including what factual circumstances would trigger a statutory obligation to report such suspected abuse. Those issues are fundamentally medical questions, even though they are not strictly questions of medical malpractice. And under Massachusetts law, expert testimony is ordinarily required for a plaintiff to prove that a health-care professional deviated from the standard of care for their specialty in exercising medical judgment. See Earley v. Slavin, 190 N.E.3d 538, 542 (Mass. App. Ct. 2022) (explaining that for a claim "aris[ing] from [the defendant's] 'exercise of medical judgment' . . . the plaintiff would be obliged to prove, among other things, that the defendant deviated from the applicable standard of care, which ordinarily would require expert testimony" (citing Palandjian v. Foster, 842 N.E.2d 916, 921 (Mass. 2006))); cf. Zaleskas v. Brigham & Women's Hosp., 141 N.E.3d 927, 942 (Mass.

- 14 -

App. Ct. 2020) ("The standard of care [in the medical context] is 'what the average qualified [health care provider] would do in a particular situation.' Expert testimony is generally required to prove medical malpractice." (second alteration in original) (citation omitted) (quoting Palandjian, 842 N.E.2d at 921)).

In opposing summary judgment, however, J.S.H. did not offer any expert's opinion on the standard of care that would have applied to Dr. Newton's decision about whether to file a report of suspected medical child abuse. Nor did she introduce any expert testimony on whether and how Dr. Newton may have breached that standard of care.

To support her NIED claim, J.S.H. did point to testimony by some of G.H.'s medical providers that they had no concerns about medical child abuse. The record also reflects that several of these providers commented on what they viewed as the unprecedented and "unwarranted" nature of Dr. Newton's actions in September 2018. For example, these providers questioned Dr. Newton's decision to place a note about suspected medical child abuse into G.H.'s medical record even though she had not interacted with him in years and then distribute that note to his treating physicians. One of G.H.'s medical providers referred to these actions by Dr. Newton as a serious "invasion of . . . privacy." And the testimony by other medical providers who treated G.H., including his primary care physician, that they did not have any concerns about medical

child abuse was certainly relevant to and supported J.S.H.'s claims.

Nevertheless, these statements by G.H.'s treating physicians did not address the standard of care for reporting suspected medical child abuse or whether Dr. Newton's conduct violated that standard. Nor is it apparent from the record that any of these physicians were specialists in medical child abuse such that they could offer an opinion on when such reports would be reasonable. And, as we have discussed, there generally must be expert testimony to establish that a physician failed to meet the relevant professional standard of care. Cf. Bellmar v. Moore, 253 N.E.3d 1224, 1227, 1231 (Mass. 2025) (concluding that a genuine dispute of material fact arose based on expert witness testimony that a medical provider's care "deviated from common accepted practice and fell below the standard of care expected of the average qualified doctor" (emphases added)). Thus, we must conclude that there was not enough evidence in the record to create a triable issue on the first element of J.S.H.'s NIED claim -- negligence -- and that summary judgment was appropriate on this claim.

Given our holding, we do not address the parties' arguments about whether J.S.H. created a genuine dispute of material fact about other elements of her claim, such as emotional distress and physical harm, including whether her affidavit

describing such distress and harm was timely. In concluding that we need not decide these issues, we cast no doubt on the emotional distress that a parent would experience from being accused of abusing their child.

### B. J.S.H.'s IIED Claim

Next, J.S.H. challenges the district court's ruling rejecting her IIED claim against Dr. Newton. The court concluded that J.S.H. did not create a triable issue on two elements of this claim: that Dr. Newton's conduct was "extreme and outrageous" and that J.S.H. suffered "severe" emotional distress. We agree that J.S.H. failed to create a genuine dispute of material fact about the "extreme and outrageous" element of this claim.

To sustain an IIED claim under Massachusetts law, J.S.H. was required to show that (1) Dr. Newton "intended to cause, or should have known that [her] conduct would cause, emotional distress"; (2) Dr. Newton's conduct was "extreme and outrageous"; (3) her conduct caused J.S.H.'s distress; and (4) J.S.H. suffered "severe distress." Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012) (quoting Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass. 1994)). "The standard for making [an IIED claim] is very high." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996)). "[L]iability [may be] found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Roman, 964 N.E.2d at 341 (second alteration in original) (quoting Foley v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987)).

The critical question on appeal boils down to the second element: whether Dr. Newton's conduct was extreme and outrageous under the circumstances. But like J.S.H.'s NIED claim, whether Dr. Newton engaged in extreme and outrageous conduct by writing the medical note in 2018 and then reporting suspected medical child abuse depends on whether Dr. Newton made a reasonable medical judgment under the circumstances. And whether her medical judgment, based on the facts known to her, was reasonable is an issue that requires expert testimony for a factfinder to resolve. Cf. Earley, 190 N.E.3d at 542; LeBlanc, 974 N.E.2d at 44.

As the district court explained, "[i]t is not 'utterly intolerable' in a 'civilized community' for medical professionals that specialize in child protection to make reasonable claims of neglect, even if they are later found by DCF to be unsubstantiated." J.S.H. v. Newton, et al., 765 F. Supp. 3d 1, 25 (D. Mass. 2025) (quoting Agis v. Howard Johnson Co., 355 N.E.2d 315, 319 (Mass. 1976)). Without expert testimony about what facts may trigger a duty to report suspected medical child abuse, a jury would not be able to discern whether Dr. Newton's conduct crossed the line into extreme and outrageous territory. Cf. Silva, 75

N.E.3d at 1138.  Because J.S.H. did not introduce any expert testimony to support her IIED claim in opposing summary judgment, she failed to create a triable issue of fact about whether Dr. Newton's conduct amounted to extreme and outrageous behavior.  Cf. Kelly v. Brigham & Women's Hosp., 745 N.E.2d 969, 979-80 (Mass. App. Ct. 2001) (rejecting the plaintiff's IIED claim when the record did not "support a theory that [the physician] recklessly misled the plaintiff or that he had actual knowledge that the procedure would be so intrusive").  Thus, the district court did not err in granting summary judgment to Dr. Newton on this claim.

## C. G.H.'s IIED Claim

J.S.H. also contests the district court's ruling on G.H.'s IIED claim against Dr. Newton.  The district court applied largely the same reasoning in rejecting the IIED claims of both G.H. and J.S.H.  We affirm the court's ruling as to G.H. because the summary judgment record shows no genuine dispute of material fact on the third element of an IIED claim: causation.  See Roman, 964 N.E.2d at 341 (identifying causation as the third element).

To support G.H.'s IIED claim, J.S.H. pointed to Dr. Newton's September 2018 medical note to his medical providers.  But J.S.H. did not identify any evidence in the record demonstrating that Dr. Newton's medical note caused G.H. severe distress.  See Howell v. Enter. Publ'g Co., 920 N.E.2d 1, 28 (Mass. 2010) (explaining that an IIED claim requires proof "that the

- 19 -

actions of the defendant were the cause of the plaintiff's distress"). The facts before us do not indicate that G.H. ever knew about, let alone saw, Dr. Newton's medical note. Nor does the record reflect that Dr. Newton's medical note resulted in G.H. being separated from his parents during the time period at issue in this lawsuit. Without evidence of causation, G.H.'s IIED claim cannot withstand summary judgment.

## D. G.H.'s Section 504 Claim

Finally, we turn to G.H.'s claim against MGH for disability discrimination in violation of Section 504 of the Rehabilitation Act. We agree with the district court that, based on the record, there was no triable issue on a critical element of G.H.'s claim.

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To prevail on a Section 504 claim, a plaintiff must prove four elements: "(1) that [he] is disabled; (2) that [he] sought services from a federally funded entity; (3) that [he] was otherwise qualified to receive those services; and (4) that [he] was denied those services solely by reason of [his] . . . disability." Thiersaint v. Dep't of Homeland Sec., 85

F.4th 653, 669 (1st Cir. 2023) (alterations in original) (internal quotation marks omitted) (quoting Lesley v. Hee Man Chie, 250 F.3d 47, 53 (1st Cir. 2001)).

The parties do not dispute that the first three elements of a Section 504 claim are satisfied here. Instead, their dispute focuses on the fourth element: whether MGH "denied" G.H. treatment based solely on his disability. On this issue, the parties' dispute is largely legal; they disagree about whether a viable Section 504 claim requires an outright denial of treatment or whether a loss of meaningful access to services is enough.

Even assuming that a loss of meaningful access to services is sufficient to maintain a Section 504 claim, G.H.'s claim fails because there is no evidence in the record that Dr. Newton's interventions in late 2018 had any impact on MGH's medical services to G.H. To support G.H.'s Section 504 claim, J.S.H. points only to Dr. Newton's medical note, Dr. Newton's report to DCF, and the testimony of G.H.'s father. But none of this evidence directly demonstrates that MGH limited, denied, or made any changes that negatively impacted the medical services it offered to G.H.

Dr. Newton's medical note and the DCF report documented her own suspicions of medical child abuse. Although the allegations raised in these documents could have negatively impacted the services that MGH offered to G.H., nothing in these

documents indicates that MGH consequently altered its services to G.H. in any way.

To be sure, G.H.'s father did claim that Dr. Newton's actions in 2018 affected the medical services that G.H. received. He testified that Dr. Newton's medical note "caused a significant amount of trouble with [G.H.'s] medical care." He described the medical note as "fairly inflammatory" because medical providers did "not want[] to treat [G.H.]" after seeing the note in G.H.'s medical record. And we have no doubt that G.H.'s father was offering his honest assessment. But his testimony on this point was not based on any direct observation or knowledge of a decrease in or deterioration of care for his child; instead, it relied largely on hearsay.

For example, although the Section 504 claim was brought against MGH, G.H.'s father testified to a change in care by only one medical provider affiliated with MGH. And as to that single provider, G.H.'s father testified that G.H.'s caregivers "decided that it was unsafe for [G.H.] to continue seeing [the provider]" because of Dr. Newton's access to MGH records, suggesting that the family itself made the decision not to pursue treatment. G.H.'s father also admitted that he "did not" speak with the MGH provider about whether it was unsafe to continue treatment or about the family's ultimate decision to discontinue treatment. Nor did G.H.'s father review any documents from the MGH provider related

to the discontinuation of treatment. Thus, the record lacks any evidence showing that MGH took any action to limit or deny care to G.H.

G.H.'s father also identified two medical providers associated with the University of Massachusetts ("UMass") who allegedly refused to treat G.H. following Dr. Newton's medical note. J.S.H. has not detailed how refusals of care by providers unaffiliated with MGH could support a Section 504 claim against MGH based on its own denial of care to G.H. But even assuming that such denials of care could be relevant to the claim against MGH, there was still insufficient evidence in the record to create a genuine dispute of material fact about whether G.H.'s medical care was negatively impacted. When G.H.'s father was asked to elaborate on how and why the UMass providers had refused to treat G.H., including any conversations he may have had with those providers on the topic, G.H.'s father responded, "Well, it wasn't really a conversation. [The UMass provider] said, I refuse to treat, and that's it." Ultimately, G.H.'s father conceded that he "did not" have any discussions with either UMass provider about their reasons for not signing onto G.H.'s care plan. Further, when asked to describe how Dr. Newton's actions were related to any refusal of care by the UMass providers, G.H.'s father acknowledged, "For the most part, I don't know how much of it is related."

Thus, we agree with the district court that there is no triable issue of fact as to whether MGH violated Section 504.[8]

## IV. CONCLUSION

For all these reasons, we **affirm** the district court's ruling granting summary judgment to Dr. Newton and MGH.

---

[8] Because we affirm the district court's Section 504 ruling on the ground that J.S.H. failed to introduce evidence that G.H. experienced any meaningful loss of services by MGH, we do not address the parties' arguments about whether a Massachusetts state law limiting the liability of charitable organizations applies here.